# ILLINOIS OFFICIAL REPORTS

## Appellate Court

<hr>

**In re Marriage of Arjmand, 2013 IL App (2d) 120639**

<hr>

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MASUD M. ARJMAND, Petitioner-Appellant, and MUNEEZA R. ARJMAND, Respondent-Appellee. |
| District & No. | Second District<br>Docket No. 2-12-0639 |
| Filed<br>Rehearing denied | October 28, 2013<br>December 9, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | After considering respondent's petition under section 2-1401 of the Code of Civil Procedure seeking to vacate the judgment dissolving her marriage, the trial court upheld the judgment but vacated the marital settlement agreement, and on appeal, the order was upheld, since the agreement was unconscionable, petitioner failed to account for his wages and investments, the evidence indicated that petitioner's annual net income was over $650,000 but his testimony indicated an annual net income of $100,000, and several assets were not even mentioned in the settlement agreement, and further, based on the finding that the agreement was unconscionable, the property classifications set forth by the parties in the agreement were not binding on the court. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 09-D-1168; the Hon. Timothy J. McJoynt, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Steven R. Merican, of Steven R. Merican, P.C., of Oakbrook Terrace, for appellant.

Bryan S. Estes, of Law Offices of William J. Stogsdill, Jr., P.C., of Wheaton, for appellee.

Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.

Justices McLaren and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1        On July 22, 2009, the circuit court of Du Page County entered a judgment dissolving the marriage of the petitioner, Masud M. Arjmand, and the respondent, Muneeza R. Arjmand. The judgment incorporated a marital settlement agreement that resolved issues as to custody, child support, and disposition of the parties' assets. On April 4, 2011, Muneeza filed a petition under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2010)) to vacate the judgment. In granting the petition, the trial court upheld the judgment but vacated the marital settlement agreement. Masud appeals from the trial court's order. We affirm.

¶ 2                                BACKGROUND

¶ 3        The parties were married on October 19, 2001. No children were born to the marriage but Masud adopted Muneeza's two children from a previous marriage, born December 16, 1992, and March 22, 1994. Muneeza's first husband, the children's biological father, had died in a car accident. The children were receiving monthly social security survivor benefits totaling approximately $3,100 per month on behalf of their deceased father.

¶ 4        On June 3, 2009, Masud filed a petition for dissolution of marriage. About seven weeks later, on July 22, 2009, a prove-up hearing was held. At the hearing, Masud was represented by counsel and Muneeza appeared *pro se*. Masud testified that the parties had entered into a joint parenting agreement (JPA) and a marital settlement agreement (MSA). He testified that there were significant assets in the marriage and that all assets, debts, and liabilities were outlined in the MSA. He testified that the MSA provided more than 50% of the marital assets to Muneeza. He further testified that the MSA provided for child support of $2,000 per month and that this approximated 28% of his net income. He also testified that Muneeza's waiver of maintenance was a result of the significant assets being given to her in the MSA. Muneeza testified that she understood each and every term of the MSA and that she entered into the agreement freely and voluntarily. She also testified that she understood she was forever waiving any claim to maintenance and she could adequately support herself with the assets she was receiving. Following the hearing, the trial court accepted the MSA and the

JPA and incorporated them into the final judgment dissolving the parties' marriage.

¶ 5       On April 4, 2011, Muneeza filed a section 2-1401 petition to vacate the judgment. Muneeza alleged that the MSA was unconscionable as it was procured by coercion and the fraudulent concealment of assets. A hearing was held on the petition over the course of 11 days, beginning on February 21, 2012.

¶ 6       At the hearing, Masud testified that his 2009 reported income was $1.8 million. A 2008 tax return filed a few months after the prove-up stated a total income of $915,000. From 2004 to 2007, his average total annual income was $1.6 million. In 2010, he had no income, just a $591,000 loss, even though he sold $1 million worth of Accenture Founder shares. The parties' joint tax returns submitted into evidence indicated that the parties had wages of $594,329 in 2002; $625,322 in 2003; $473,980 in 2004; $393,326 in 2005; $394,428 in 2006; $364,726 in 2007; $656,066 in 2008; and $23,384 in 2009. The parties had total income of $1,196,631; $1,897,704; $1,416,519; $944,493; $2,429,577; $1,887,724; $915,878; and $1,009,522 in those same years, respectively. In addition to wages, the total income was attributed mostly to capital gains and dividends.

¶ 7       During the marriage Masud worked for Accenture LLP. On May 31, 2001, a few months before the marriage, he received 441,044 Accenture Founder shares. He did not pay for these: they were granted to him when the company went public. They were given in return for his previous work and to entice him to stay with the company. He could sell only a certain number of shares every year. He periodically sold shares every year during the marriage. Proceeds from the sales during the marriage totaled $8.56 million. He retired from Accenture at the end of 2008. When he moved out of the marital home, he moved into a condominium on McClurg Court in Chicago.

¶ 8       Masud denied making any threats to Muneeza and denied telling her brother, Aatif, that the "gloves would come off" if Muneeza hired an attorney to represent her during the divorce. Masud believed that $5,500 per month was what Muneeza needed to live on, because that was what she spent to run the household during the marriage. Between the $2,000 in monthly child support, the children's social security survivor benefits, and the monthly income from an investment in Montreal Cyclotron, Muneeza could maintain the same standard of living. (Montreal Cyclotron was a laboratory that produced isotopes for cancer tests. The parties had invested $110,000 in 2003. An exhibit indicates that it provided monthly income of about $500.) Masud did not consider the statutory guidelines in setting the monthly child support amount. Rather, he considered only what was needed for Muneeza to maintain her lifestyle.

¶ 9       During the marriage, funds from the sales of Accenture Founder shares went into four bank accounts. These were joint accounts held with Muneeza; she was a signatory and could write checks when necessary. She did not have passwords or log-ins for the accounts. He had no intent to make a gift of the Accenture Founder shares to the marriage. However, he discussed all his investments with Muneeza and admitted that she was named as a partner on some of the investments.

¶ 10      He established NAZ, LLC (NAZ), during the marriage. NAZ owned the condominium on McClurg Court where he lived. He held a 100% interest in NAZ. DLR Properties (DLR)

was established during the marriage. Muneeza had no interest in DLR and he had a 50% interest. In July 2009, DLR owned vacant land. He established Red River Plainfield, LLC (RRP), during the marriage. He had a 100% interest. RRP owned two parcels of land: a vacant lot and a lot leased to and improved with a McDonald's. Naperville South Commons, LLC (NSC), was established in 2004. He did not have an ownership interest in NSC until 2007, when Muneeza transferred her ownership interest to Masud. NSC owned two condominium buildings, one with 16 condominiums and one with 5. The land was purchased and condominiums were built during the marriage. Red River Group (RRG) was established during the marriage and purchased a 2.5% interest in Younan Properties. Younan Properties owned three office buildings in Houston, Texas. Masud acknowledged that in 2009 he had no interest in RRG. He believed that Muneeza had a 100% interest. Masud testified that he believed that NAZ, DLR, RRP, NSC, and RRG were nonmarital assets because they were purchased with funds from the sale of Accenture Founder shares.

¶ 11      Oak Forest Properties, LLC (OFP), was also established during the marriage. OFP owned a shopping center in Oak Forest. Although it was full of tenants at the time of the hearing on Muneeza's petition, it had a negative net value at the time of the prove-up. Muneeza was listed on OFP's tax returns as having a 50% interest.

¶ 12      Masud testified that the loans that had to be repaid on all the properties totaled $13 million. It cost him about $78,000 per month to maintain the loans. After the divorce, he devoted his time to managing the properties. The investments were losing money on a monthly basis and he was funding the losses by selling Accenture Founder shares.

¶ 13      During the marriage, the parties also purchased residential property on Donwood Drive in Naperville (the Donwood property). The land was purchased in 2005 for about $600,000 and there had been $2 million worth of improvements made. Residential property was also purchased on White Oak in Naperville (the White Oak property) during the marriage. The property was purchased in the name of Nora Investments, for his first wife and his biological daughter. He had no legal obligation to buy them a home. Although he did not hold title to the property at the time of the prove-up, title was transferred to him after the dissolution. Finally, at the time of the prove-up, there was a contract pending for the construction of a condominium on Van Buren Street in Chicago (Van Buren property). A down payment was made during the marriage and Masud closed on the property in November 2009. Masud had purchased the marital residence on White Eagle Drive in Naperville in 2001, prior to the marriage. During the marriage, Muneeza's name was placed on the deed of the marital home.

¶ 14      Masud testified that the MSA granted Muneeza the following marital assets: $300,000, jewelry, two cars, furniture, clothes, and the investment in Montreal Cyclotron. He testified that Muneeza received more than 50% of the marital assets. Masud testified that he received everything else, assets and liabilities. However, he acknowledged that Muneeza was still liable on two loans for OFP. Masud claimed that this was a mistake and that he intended to be responsible for those loans. Masud acknowledged that Oak Park Open MRI was Muneeza's nonmarital asset. She had invested $250,000 prior to the marriage. Masud testified that he had the following assets in 2009: a 401(k) with Accenture worth $250,000 and an individual retirement account (IRA) with Hewitt Benefit Systems worth $240,000. The IRA had been merged with a Smith Barney IRA. Half of the Smith Barney IRA funds

were marital.

¶ 15 Our own review of the MSA indicates that it granted Muneeza, as nonmarital assets: Oxford Bank checking accounts, an IRA, an interest in Oak Park Open MRI, and all jewelry and clothes purchased prior to the marriage. Masud was granted the following, as nonmarital assets: furniture, clothes, multiple bank accounts, two life insurance policies, his remaining Accenture Founder shares, the Smith-Barney IRA, and all interest in NSC, RRG, RRP, DLR, and NAZ. Of the marital assets, Muneeza received $300,000 cash, half the proceeds in excess of $300,000 on the sale of the marital residence, furniture, jewelry, a joint checking account, two cars, the interest in Montreal Cyclotron, and "the cash investment account currently valued at approximately $80,000 in the Oak Park MRI." Of the marital assets, Masud received the Donwood property, a car, investments in two banks, and OFP.

¶ 16 At the hearing on Muneeza's petition, Masud estimated that Muneeza's nonmarital assets had a value of $170,000 and that her marital assets had a value of $1 million. He estimated that his nonmarital assets had a gross value of $14 million, with liabilities of $9.4 million, for a total net value of $4.6 million. He opined that his marital assets had a net value of $1 million. Muneeza admitted into evidence, as her exhibit No. 3, a personal financial statement completed by Masud on May 15, 2009. The document stated that he had total assets worth $28.4 million and liabilities of $12.3 million, for a total net worth of $16.1 million. The statement also indicated that he had a total annual income of $1.66 million. Muneeza also submitted, as her exhibit No. 4, a personal financial statement completed by Masud on May 27, 2010. The document stated that he had total assets worth $31.5 million and liabilities of $12.5 million, for a total net worth of $19 million. The statement also indicated that he had a total annual income of $1.99 million. Muneeza also submitted, as exhibits, the parties' federal tax returns for the years 2004 through 2008.

¶ 17 Muneeza testified that Masud moved out of the family home on December 18, 2008. During the marriage, she did not work outside the home. In January 2009, she had started working part-time in human resources for $18 per hour. She did not see or speak to Masud until the prove-up hearing on July 22, 2009. Aatif was communicating with Masud on her behalf regarding the MSA. In July 2009, she was suffering emotional distress. Her mother was in hospice, her father was suffering congestive heart failure, her marriage had failed, and she had to find a new place to live. In April 2009, as communicated through Aatif, Masud had stated that if she hired an attorney "the gloves would come off." He threatened to take her children and ruin her family name. She came into the marriage with $300,000 in a brokerage account and $220,000 from the sale of her premarital home. These assets were commingled with marital assets.

¶ 18 Muneeza acknowledged that, at the prove-up hearing, she had testified that she wanted to proceed *pro se*, that she understood the MSA and the JPA, and that she signed the MSA freely and voluntarily. However, at the hearing on her section 2-1401 petition, she testified that she was under duress at that time. She had thought that Masud's attorney was representing both of them. She had not understood the waiver of maintenance and had felt scared by Masud's threat to take her children away from her. Muneeza acknowledged that her section 2-1401 petition did not allege that Masud had made threats to fight for custody. When she signed the MSA she was not sure of all the assets but thought she had no option

other than to sign the MSA.

¶ 19    Muneeza acknowledged that she never asked Masud for a financial statement before the divorce. She acknowledged that, in her petition, she alleged the concealment of assets. However, she was aware that the White Oak property was purchased in 2007 and was not listed in the MSA. She stated that in July 2009 Masud had an interest in Younan Properties. She knew that Younan Properties was not listed in the MSA. She testified that she had an interest in the Van Buren property. The down payment was made in 2007. When she signed the MSA, she knew that the Van Buren property was not listed. Muneeza testified that, although she knew of these assets in 2007, she did not know whether they still existed in 2009. Muneeza also testified that she had an interest in OFP, but she had signed her interest over to Masud prior to the divorce.

¶ 20    Muneeza further testified that she believed that she had an interest in NSC in July 2009. When shown Masud's exhibit No. 27, which showed that she transferred her interest to Masud in 2007, she testified that she did not remember doing so. Muneeza acknowledged that in her petition she alleged that Masud received $20 million worth of assets. This was based on her exhibit No. 1, Masud's personal financial statement dated May 25, 2007, indicating that his net worth was $20 million. She received this document in October 2010 from a banker with whom she and Masud had worked. She did not know which assets were marital or nonmarital.

¶ 21    On May 3, 2012, the parties made closing statements. On May 14, 2012, the trial court issued a written opinion and order granting the petition. In making its determination, the trial court noted that it considered all the evidence presented, the credibility of the witnesses, the prove-up transcript, the exhibits, arguments of counsel, applicable case law, and the relevant portions of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2010)). The trial court found that there was no evidence of either coercion or duress in reaching the MSA and that Muneeza "did very little as to due diligence."

¶ 22    The trial court noted that Muneeza's theory was that the distribution of the assets was unfair, regardless of their classification (marital or nonmarital). The trial court further noted that Masud's trial evidence of the value of the assets at the time of the prove-up differed greatly from bank loan applications made during the latter part of the marriage. Specifically, a loan application in 2007 indicated total holdings of $27 million and a 2008 loan application estimated Masud's net worth at $18 million. Additionally, a 2009 statement indicated that Masud's annual net income was $1.6 million. At the hearing, Masud stated that pursuant to the MSA he received about $5.5 million in nonmarital assets and $1 million in marital assets. The trial court expressed disbelief that Masud's net worth declined 75% between 2007 and 2009. Further, it noted that Muneeza's exhibit No. 4 indicated that Masud had $19 million in net assets as of May 27, 2010. That same exhibit also indicated that Masud had a net income of $1.9 million and receivables due of over $3.9 million. The trial court found that it could not give any weight to Masud's "moving targets" of estimated values, especially since Masud had failed to offer any expert testimony.

¶ 23    The trial court found that Masud received all of the substantial real estate holdings, both marital and nonmarital. Muneeza received $300,000, some accounts, cars, and jewelry, with

a combined value of about $1 million. However, the trial court noted that the values of the cars, jewelry, and accounts were based solely on Masud's testimony and that there was no other evidence supporting the valuations. The trial court noted that the vast majority of the assets were retained by Masud and that, if they were classified as marital, the asset division was "substantially disparate." The trial court also noted that, even if some of these holdings remained nonmarital, the asset division was still not close to equal. The trial court further stated that "[a] waiver of maintenance in an eight year plus marriage with a large disparity of income also has to be looked at by the court despite [Muneeza's] ill-advised participation in the Prove-up."

¶ 24    The trial court noted that throughout the marriage Masud was selling Accenture Founder shares and receiving substantial amounts of money. Masud believed that the proceeds were nonmarital because the stock was acquired before the marriage. The trial court also noted that Masud testified that the proceeds were used to make nonmarital investments in real estate and that Muneeza was removed from these business dealings and the accounts. However, the trial court found that Muneeza was involved in most of the real estate holdings. She was a joint owner on many of the accounts and was a member, agent, or officer of many of the holding companies. From 2004 to 2006, she was the sole owner of NSC. When RRG was formed in 2007, Muneeza was the manager and agent for the company. Further, although Masud alleged at the hearing that OFP was nonmarital like the other real estate investments, it was listed as marital in the MSA. The trial court also found significant that Masud's wages, which would have been marital property, far exceeded the household expenses and there was no explanation as to where the remaining wages were directed. The trial court assumed that some of Masud's wages must have been used for asset purchases during the marriage. The trial court found that this established a presumption that the real estate investments made during the marriage were marital property.

¶ 25    The trial court found that no values of any assets were set forth either at the prove-up or in the MSA. Additionally, neither Younan Properties nor the Van Buren property was mentioned in the MSA. The trial court noted that RRP was acquired in 2008 for $1.8 million; NSC owned 2 buildings and 21 condominium units; and the Donwood property was purchased for $600,000 and the parties had made $2 million worth of improvements. Under the MSA, Masud received all these properties. The trial court noted that Muneeza was to receive half of any proceeds from the sale of the White Eagle house, but that there was no obligation for Masud to sell the house.

¶ 26    As to child support, the trial court noted that there was no disclosure in the MSA or at the prove-up as to Masud's net income. The trial court found that Masud's income throughout the marriage exceeded $650,000 per year. After the prove-up, Masud's 2008 tax return became available and indicated that his net income was $915,000. The $2,000-per-month child support allocation set forth in the MSA did not meet the statutory guidelines for this income, and the MSA failed to provide a reason for any deviation. The trial court noted Masud's testimony that he had not considered child support guidelines but considered only what he believed was needed for Muneeza and the children to continue their "lifestyle." In so doing, Masud asserted that the social security income received by the children on behalf of their deceased biological father should offset Masud's child support obligation. The trial

court noted that this was "not the law and clearly wrong."

¶ 27    In summary, the trial court found the MSA unconscionable based on the unequal division of assets, the failure to meet the statutory child support guidelines, and the lack of disclosure of all the assets. The trial court upheld the judgment for dissolution but vacated the MSA. The trial court ordered the parties to update discovery so that the court could set a date for further proceedings addressing the proper division of assets, the proper amount of child support, and the issue of maintenance. Thereafter, Masud filed a timely notice of appeal pursuant to Illinois Supreme Court Rule 304(b)(3) (eff. Feb. 26, 2010).

¶ 28                                  ANALYSIS

¶ 29    On appeal, Masud argues that the trial court erred in granting Muneeza's section 2-1401 petition. The purpose of a section 2-1401 petition is for a party to bring to the court's attention facts that, if known to it at the time it rendered its judgment, would have changed the court's determination. *In re Marriage of Johnson*, 339 Ill. App. 3d 237, 241 (2003). To present a claim for relief under section 2-1401, the petitioner must set forth factual allegations supporting: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting the defense or claim in the original proceedings; and (3) due diligence in filing the section 2-1401 petition. *In re Marriage of Callahan*, 2013 IL App (1st) 113751, ¶ 17. Relief under section 2-1401 is available to set aside a marital settlement agreement that is unconscionable or was entered into as a result of duress, coercion, or fraud. *Id.*

¶ 30    "The term 'unconscionability' includes 'an absence of a meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *In re Marriage of Carlson*, 101 Ill. App. 3d 924, 930 (1981) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)). There are two types of unconscionability: procedural and substantive. *Callahan*, 2013 IL App (1st) 113751, ¶ 20. Procedural unconscionability involves "impropriety during the process of forming a contract that deprives a party of [a] meaningful choice." *Id.* Substantive unconscionability involves a situation in which a clause or term in the contract is totally one-sided or harsh. *Id.* A finding of unconscionability can be based on either procedural or substantive unconscionability, or a combination of both. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 774 (2007). To determine whether an agreement is unconscionable, the court must consider two factors: (1) the circumstances and conditions under which the agreement was made; and (2) the economic circumstances of the parties that result from the agreement. *In re Marriage of Bielawski*, 328 Ill. App. 3d 243, 251 (2002).

¶ 31    We note that the parties here dispute the standard of review. Masud asserts that substantive unconscionability is reviewed *de novo* and that the trial court's factual determinations are reviewed under the manifest-weight-of-the-evidence standard. Muneeza argues that, when a section 2-1401 petition is granted after a trial court conducts an evidentiary hearing, the trial court's judgment is reviewed under the manifest-weight standard. We reject Masud's assertion regarding *de novo* review and note that the case law he cites is not in the context of a section 2-1401 petition. See *Tabassum*, 377 Ill. App. 3d at 777 (reviewing *de novo* the trial court's determination, in a dissolution proceeding, that a

postmarital agreement was unconscionable).

¶ 32   In *Domingo v. Guarino*, 402 Ill. App. 3d 690, 699 (2010), this court addressed the standard of review to be applied to a section 2-1401 determination following an evidentiary hearing. In that case, this court interpreted *dicta* contained in *People v. Vincent*, 226 Ill. 2d 1, 17 n.5 (2007), to favor the manifest-weight-of-the-evidence standard when reviewing such a determination. *Domingo*, 402 Ill. App. 3d at 699. A determination is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶ 35. However, the most recent supreme court holding indicates that the grant or denial of a section 2-1401 petition lies within the sound discretion of the trial court, depending on the facts and equities presented. *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 95 (2006) (quoting *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 221 (1986)). A trial court abuses its discretion only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Severino*, 298 Ill. App. 3d 224, 229 (1998). We need not decide whether to follow *Paul* or the *dicta* in *Vincent*, because, under either standard, the trial court's determination was not error.

¶ 33   In the present case, the trial court did not err in determining that the MSA was unconscionable. The record reveals that the parties had acquired substantial real estate holdings during the marriage. Masud argued that the real estate investments were nonmarital because the properties were purchased with nonmarital funds. The trial court found that Masud failed to rebut the presumption that some of these properties were marital. This determination was supported by the evidence. The trial court noted that Muneeza was involved in many of these transactions. She was an agent or member of many of the holding companies, she was a joint owner on the checking accounts of the holding companies, and during the marriage she held an interest in some of the assets, such as NSC, RRG, OFP, the Van Buren property, and the Donwood property.

¶ 34   Furthermore, the trial court noted that most of the wages earned by Masud during the marriage were unaccounted for and thus must have been used to purchase some of the real estate investments. Evidence showed that Masud's wages for the eight years during the marriage exceeded $650,000 per year. Masud testified at the hearing on the petition that Muneeza ran the household on $5,500 per month. Based on that testimony, Masud's wages during the marriage that were not used for household expenses exceeded $4.6 million. There was no explanation as to how these wages were spent. As such, the trial court's determination that some of Masud's wages must have been used to purchase real estate was not improper.

¶ 35   Under the MSA, Masud received the majority of the real estate investments purchased during the marriage. Masud testified that, at the time of the prove-up, these allegedly nonmarital assets were worth $5 million. However, the trial court found this assertion disingenuous in light of financial statements indicating that the assets had a net worth of $20 million. The trial court is in the best position to judge the credibility of the witnesses and resolve conflicts in the evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 6 (questions of witness credibility and conflicting evidence are matters for the trial judge to resolve as the trier of fact). Accordingly, we decline to disturb the trial court's factual determinations. Furthermore, the evidence indicates that the assets were purchased with $8.6

-9-

million of proceeds from the sale of Accenture Founders shares and $4.6 million of unaccounted-for wages and thus were potentially marital. Accordingly, the evidence indicates that the division of assets was clearly one-sided and oppressive in light of the parties' disparity in income, their unequal earning potential, and the lack of a maintenance award.

¶ 36   The finding that the MSA was unconscionable is further supported by the lack of information provided to the trial court at the prove-up. See *In re Marriage of McGlothlin*, 312 Ill. App. 3d 1145, 1148-49 (2000) (misrepresentation or concealment of facts from the court was sufficient grounds to vacate a judgment). At the prove-up, Masud testified that child support of $2,000 per month represented 28% of his net income. This would equate to an annual net income of about $100,000. However, evidence indicated that Masud's annual net income exceeded $650,000. Further, Masud's testimony at trial implied that he had considered the statutory guidelines in setting the child support number. However, at the hearing on the section 2-1401 petition, Masud testified that he had not considered the statutory guidelines; rather, he had considered only the children's "lifestyle." (The record raises the concern that Masud's attorney failed in his duty to make a reasonable inquiry to determine if the MSA was grounded in fact. Ill. S. Ct. R. 137 (eff. July 1, 2013). The MSA, prepared by the attorney, indicated that the child support amount represented 28% of Masud's net income. However, Masud's testimony that he did not consider the statutory guidelines suggests that the attorney did not conduct a good-faith review of the statutory guidelines with Masud before preparing the MSA.)

¶ 37   Additionally, Masud testified at the prove-up that all the assets, debts, and liabilities were outlined in the MSA. However, the evidence showed that there were several assets not listed in the MSA, such as the White Oak property and the Van Buren property. Additionally, he testified that Muneeza had received over 50% of the marital assets. However, as noted above, Masud failed to establish that all of his real estate holdings were nonmarital. Therefore, because Muneeza received essentially none of those assets, Masud received a disproportionate share of the marital assets. Based on the evidence indicating that the division of assets was not in just proportions, and given the misrepresentations to the trial court at the prove-up, we cannot say that the trial court's finding the MSA unconscionable was against the manifest weight of the evidence or an abuse of discretion.

¶ 38   In so ruling, we note that Masud argues that the petition should have been denied because, as the trial court found, Muneeza failed to establish due diligence. However, the requirement that a party seeking relief under section 2-1401 must demonstrate due diligence is not inflexible. *Johnson*, 339 Ill. App. 3d at 243. In cases involving misleading testimony and lack of full disclosure, principles of equity require relaxing the diligence requirement and vacating the settlement agreement. *Id.* (citing *McGlothlin*, 312 Ill. App. 3d at 1149). In the present case, Masud misled the trial court as to the existence of marital and nonmarital assets, their value, and his net income. Neither the setting of child support nor the division of assets complied with statutory requirements. See 750 ILCS 5/503(d) (West 2010) (requiring that marital property be divided in "just proportions"); 750 ILCS 5/505(a) (West 2010) (requiring that child support for two children be equal to 28% of the supporting party's net income and that the trial court give reasons for any variance from this guideline). Under these circumstances, we conclude that, regardless of whether Muneeza acted with diligence,

the trial court properly granted her petition.

¶ 39 Masud also argues that substantive unconscionability must be based on the parties' economic circumstances immediately following the MSA and that Muneeza failed to show such financial circumstances. Masud is correct that "[t]he determination of unconscionability focuses on the parties' relative economic positions *immediately following the making of the agreement*." (Emphasis added.) *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1080 (1992). Nonetheless, there was sufficient evidence of the parties' financial circumstances immediately following the signing of the MSA. As noted by the trial court, Muneeza left the marriage with $300,000, some accounts, two cars, jewelry, and clothing. Even using Masud's valuation, the total value of the assets was about $1 million. Although Muneeza did not work outside the home while married, after Masud moved out of the marital residence she started working 20 hours per week for $18 per hour.

¶ 40 The evidence at the hearing showed that, pursuant to the MSA, Masud received all of the substantial real estate holdings. A personal financial statement dated May 15, 2009, indicated that the parties' total assets were worth $27 million. A personal financial statement completed by Masud, dated May 27, 2010, showed total assets worth $31.5 million. The trial court found incredible Masud's assertion that his net worth at the time of the prove-up was only $4 million, because there was no expert evidence and the growth ($4 million in July 2009 to $31.5 million in May 2010) was unbelievable. We decline to disturb the trial court's credibility determinations. *Sturm*, 2012 IL App (4th) 110559, ¶ 6. The evidence also showed that, at the time of the prove-up, Masud had a total income that exceeded $1 million. As such, there was sufficient evidence of the parties' financial circumstances immediately following the MSA.

¶ 41 Masud next argues that the trial court erred in finding the MSA one-sided, because the trial court should not have been considering the classifications of the assets. Rather, Masud argues, the trial court was bound to accept the property classifications made by the parties in their MSA. We acknowledge that, pursuant to the Act, nonmarital property can include property excluded by a valid agreement of the parties. See 750 ILCS 5/503(a)(4) (West 2010). However, agreements regarding the disposition of property, and regarding maintenance, are not binding upon the court if they are unconscionable. 750 ILCS 5/502(b) (West 2010); *Blisset v. Blisset*, 123 Ill. 2d 161, 167 (1988). Masud argues that agreements are binding as long as they are not procedurally unconscionable, as in this case. However, the foregoing authority belies this proposition. Here, the trial court properly found the MSA to be substantively unconscionable. As such, the property classifications set forth by the parties in the MSA are not binding upon the court. *Id.*

¶ 42 Masud further argues that the trial court's finding of transmutation was against the manifest weight of the evidence. "Property acquired during a marriage is presumptively marital [citation], and the presumption can be overcome only by clear and convincing evidence [citation]." *In re Marriage of Steel*, 2011 IL App (2d) 080974, ¶ 57. "Although the placement of nonmarital funds into a joint checking account may transmute the nonmarital funds into marital property [citations], nonmarital funds that are placed into a joint account merely as a conduit to transfer money will not be deemed to be transmuted into marital property [citations]." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 673 (2008).

-11-

¶ 43    In the present case, Masud submitted a document he prepared that showed: (1) when Accenture Founder shares were sold, (2) the net proceeds, and (3) the account into which those funds were deposited. He then presented exhibits to show that the funds used to purchase real estate investments through NSC, NAZ, RRP, DLR, OFP, and Younan Properties, and the funds used to purchase the Van Buren property, came from those accounts. We note that the accounts into which the funds were deposited are presumed marital as Muneeza was a joint holder of those accounts. However, the funds could still be nonmarital if the accounts were used only as conduits. Masud failed to establish by clear and convincing evidence that the accounts were used merely as conduits. There is no evidence that Masud intended to keep the marital and nonmarital assets separate. Muneeza's name was on most, if not all, of the personal and business checking accounts, with no apparent restrictive status. Muneeza was also an agent or member of many of the holding companies and she held interests in some of the real estate assets at various times during the marriage. Although the White Eagle house was purchased prior to the marriage, Muneeza's name was placed on the title and the mortgage during the marriage. Finally, we note that the trial court found troubling Masud's "11th hour disclosure" of bank and loan statements allegedly supporting a tracing of his nonmarital funds. We agree that Masud's evidence was sketchy at best. For example, although Masud identified the accounts into which the Accenture Founder shares' proceeds were placed, and showed that funds from those accounts were used toward his real estate investments, there was no evidence to show if any other funds went in and out of those accounts. Additionally, the Accenture Founder shares' proceeds were not immediately withdrawn from the accounts to purchase real estate, but sometimes remained in the accounts for substantial periods of time. Accordingly, we cannot say that the trial court's determination as to transmutation was against the manifest weight of the evidence or an abuse of discretion.

¶ 44    Masud also argues that the child support amount set forth in the MSA complied with the statutory guidelines. Specifically, Masud argues that the trial court erred in (1) considering the proceeds from the sale of his Accenture Founder shares as income and (2) failing to consider the children's social security survivor benefits.

¶ 45    Masud's first argument is premature because the trial court did not make a determination as to Masud's income at the time of the prove-up and did not establish a proper amount of child support. The trial court found only that the $2,000 per month in child support did not meet the statutory guidelines. This determination was not error. Under the statutory guidelines for two children, child support of $2,000 per month would equate to an annual net income of about $86,000. Tax returns presented at the hearing on Muneeza's petition indicated that Masud's wages were $393,326 in 2005; $394,428 in 2006; $364,726 in 2007; and $656,066 in 2008. Masud presented a 2009 tax return that indicated his 2009 wages were $23,384. However, a personal financial statement dated May 15, 2009, indicated that he had a salary of $703,197, dividend and interest income of $150,000, real estate income of $403,749, and other income of $25,000. Accordingly, even if we overlooked the proceeds from the sale of the Accenture Founder shares, the evidence indicated that Masud had a net income that far exceeded $86,000 per year.

¶ 46    Second, Masud argues that the trial court erred in failing to consider the children's social

security survivor benefits as satisfying Masud's support obligation. In so arguing, Masud relies on *In re Marriage of Henry*, 156 Ill. 2d 541 (1993), and *In re Marriage of Newberry*, 346 Ill. App. 3d 526 (2004). In *Henry*, the reviewing court determined that payment of social security dependent disability benefits satisfied a noncustodial parent's child support obligation because the benefits had been earned by the noncustodial parent and were made on his behalf. *Henry*, 156 Ill. 2d at 552. In *Newberry*, the reviewing court determined that adoption subsidies served as a basis for a downward deviation from the noncustodial parent's statutory child support obligation. *Newberry*, 346 Ill. App. 3d at 530-31.

¶ 47    Neither of these cases supports Masud's assertion. Unlike in *Henry*, the social security benefits here are not being paid to the children on Masud's behalf. *Newberry* suggests that social security benefits can be a basis to deviate from statutory guidelines. *Newberry* does not hold that the benefits must be considered or that they necessarily justify a deviation. Moreover, the only issue we are addressing at this point is whether the grant of Muneeza's petition was against the manifest weight of the evidence or an abuse of discretion. The evidence supports a determination that the asset division was unconscionable and that the child support amount failed to meet the statutory guidelines. The trial court has yet to determine Masud's net income, set a proper amount of child support, or determine whether the children's social security benefits should have any weight in the child support determination.

¶ 48    Masud's final contention is that the defects in the MSA, as set forth in the trial court's written opinion, either were not defects or were insignificant. The trial court found that mutual mistake was a factor that it could consider in making its determination on the section 2-1401 petition. The trial court proceeded to note 14 defects. Most of the defects are confirmed by the evidence. However, a couple are not errors. For example, the trial court noted that the MSA did not include an obligation for Masud to pay for the children's wedding and college expenses. However, the evidence did not indicate that the MSA was supposed to include such provisions. Masud testified only that Muneeza's parents had made such a request. There was no evidence that the parties had agreed to such provisions and failed to include them. Further, contrary to the trial court's finding, the MSA did include a provision that the parties would contribute to the children's college expenses, based on the financial circumstances of the children and the parties. Nonetheless, these errors do not provide a basis to disturb the trial court's finding that the MSA was unconscionable.

¶ 49    Upon vacating the MSA, the trial court ordered the parties to update discovery so it could set hearings to address the proper division of assets, maintenance, and child support. Nothing in this opinion should be construed as a determination on any of these issues. We hold only that the trial court did not err in granting Muneeza's section 2-1401 petition and vacating the MSA.

¶ 50                                         CONCLUSION
¶ 51    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 52    Affirmed.