NOTICE
Decision filed 01/23/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220493-U

NO. 5-22-0493

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JENNIFER ENGLISH, | ) | Massac County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 21-D-21 |
| | ) | |
| MICKEY RYAN ENGLISH, | ) | Honorable |
| | ) | Todd D. Lambert, |
|     Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion in accepting and proceeding on a petition for dissolution containing minor inaccuracies. The court did not abuse its discretion in awarding maintenance. The court's finding that a piece of real estate conveyed to the parties by the respondent's father during the marriage was marital property was not against the manifest weight of the evidence. For these reasons, we affirm the trial court's judgment.

¶ 2   The respondent, Mickey Ryan English, appeals from a judgment dissolving his marriage to the petitioner, Jennifer English. He argues that the court abused its discretion by (1) accepting and proceeding on a petition for dissolution in which Jennifer made inaccurate statements, (2) awarding Jennifer maintenance, and (3) finding a piece of property conveyed to the parties by Mickey's father during the marriage to be marital property. We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    The parties were married in March 2004. One child was born to the parties later that year, and Mickey subsequently adopted Jennifer's three children from a prior relationship.

¶ 5    When the parties married, Jennifer was attending college. However, she dropped out when she became pregnant with the parties' youngest daughter, McKenzie. For much of the marriage, Jennifer was a homemaker and the primary caregiver to the four children, while Mickey worked outside the home.

¶ 6    The parties initially lived in a double-wide trailer on a property owned by Jennifer's parents. In November 2013, however, Mickey's father, Matthew English, conveyed to them an eight-acre parcel of land at 3200 Mick English Road. Mickey notes in his brief that Mick English Road was named for his grandfather. The deed indicated that Matthew was conveying the property "to Mickey English and Jennifer English, as husband and wife, not as tenants in common, but as joint tenants with a right of survivorship." The parties began building a home on the property, although the record is not entirely clear as to when the home was completed.

¶ 7    In February 2020, the parties separated. Initially, Jennifer lived in a 2004 camper on the couple's land at 3200 Mick English Road. In the summer of 2021, however, she moved the camper to her parents' property at 8145 Unionville Road.

¶ 8    On April 21, 2021, Jennifer filed a petition for dissolution of marriage. She alleged that Mickey was "secretive regarding his residence" and that she did not know where he resided. She further alleged that four children were born to the parties and that none were adopted. She alleged that Mickey worked as a plumber and steamfitter while she worked at Dollar General Store. She requested maintenance and that she be given custody and awarded child support for two minor children. We note, however, that only McKenzie was still a minor at this point. The parties' next

2

youngest child, Victoria, turned 18 in August 2020, after the parties separated but before Jennifer filed her petition for dissolution.

¶ 9    On May 24, 2021, Mickey filed an answer to Jennifer's petition. He partially denied the allegations in paragraph 7 of her petition, wherein she had alleged that four children were born to the parties and none were adopted. He alleged that three children who were now adults (Michael, Elizabeth, and Victoria) were adopted by the parties. Mickey also denied Jennifer's allegation that she did not know where he lived. He asserted that Jennifer should not be awarded maintenance, and he requested that the parties be granted equal parenting time with McKenzie and that neither party be ordered to pay child support to the other.

¶ 10    On August 19, 2021, Jennifer filed a motion for temporary relief. She alleged that Mickey was employed by the plumber and steamfitter union and was earning a "earning a substantial income." She requested temporary maintenance and temporary custody and child support for the parties' minor child, McKenzie. She also requested exclusive possession of the parties' 2004 Youngblood camper, two horses, a pet dog, and a 1995 Toyota Forerunner. Attached to the motion was a financial affidavit, in which Jennifer averred that her estimated gross monthly income was $1790, including her wages and benefits from Supplemental Nutrition Assistance Program (SNAP) and Temporary Assistance to Needy Families (TANF). She also averred that she did not reside with another adult who could assist with payment of bills.

¶ 11    The motion came for a hearing by Zoom on September 21, 2021. However, the matter was continued because the parties had agreed to hold a settlement conference.

¶ 12    In October 2021, the parties' youngest daughter, McKenzie, began living with Mickey. Prior to this time, she had lived with Jennifer.

¶ 13    On April 20, 2022, the case came for a final hearing. At the outset, counsel for Jennifer informed the court that the parties had agreed to an equal division of Mickey's pension plan and a distribution of marital personal property, including the camper, vehicles, and family pets. In addition, he noted that the parties had agreed that Mickey would have primary parenting time with McKenzie, that McKenzie could decide when she wanted to spend time with Jennifer, and that they would share parental responsibility. Counsel noted that the only three issues remaining to be resolved were maintenance, child support, and the property at 3200 Mick English Road.

¶ 14    Jennifer testified that the parties had one biological child together and that Mickey adopted her three older children. She further testified that she was attending college when she married Mickey in 2004, but she dropped out of school because she became pregnant. She did not go back to school or work during most of the marriage. When asked if she and Mickey ever discussed putting the children in daycare, Jennifer testified that they thought it was better for her to care for the children herself because this would be a safer, less expensive option.

¶ 15    Jennifer further testified that, at the time of the hearing, she was living in the parties' 2004 Youngblood camper on property owned by her father at 8145 Unionville Road. She stated that when the parties were first married, they lived on that property in a double-wide trailer home owned by Jennifer, but that they subsequently moved to the property at 3200 Mick English Road.

¶ 16    She next testified concerning the parties' acquisition of the property at 3200 Mick English Road. She stated that they purchased the property from Mickey's father, Matthew English, for one dollar per acre in 2013. She testified that Matthew had obtained the property from his father. She stated, however, that portions of the property had been sold to non-family members. When the parties purchased the property, there was no house on it, but they began building one. Jennifer was asked about the materials used to build the house. She explained that they used materials from her

4

double-wide trailer, wood from trees Mickey cut down on the new property, and additional materials that they had to buy.

¶ 17    Jennifer testified that she was a homemaker for most of the marriage. However, she testified about a series of jobs she held beginning in 2018, two years before the parties separated. She noted that, at that time, Mickey had been laid off from work. She first worked at the Huddle House in Metropolis, a position she held for almost two years. She explained that she quit this position for two reasons. First, she stated that she was being asked to do the job of an assistant manager without receiving the pay of an assistant manager. Second, she stated that she became uncomfortable due to rumors that she was cheating on her husband. When asked who started the rumors, Jennifer indicated that it was Mickey.

¶ 18    The next position Jennifer held was at Southgate Rehabilitation, a nursing home in Metropolis. She worked there for almost nine months, but she quit the position due to low pay, "not good hours," and "an issue with the boss knowing Mickey's mother" at a time when Mickey was not on speaking terms with his mother. Jennifer then worked at Dollar General Store for nearly a year. During that time, she moved from 3200 Mick English Road to her father's property at 8145 Unionville Road. She testified that the move increased her commuting time, and she therefore quit her job. Finally, she worked at McDonald's for three months before quitting after she had a severe allergic reaction to fish. Jennifer did not testify concerning her income at any of these positions. However, the record contains a 2021 W2 form indicating that she earned a gross income of $10,210.75 from Dollar General that year.

¶ 19    Jennifer testified that at the time of the hearing, she was unemployed and was not receiving any form of public assistance. She explained that although she received SNAP and TANF benefits while McKenzie was living with her, those benefits stopped after McKenzie went to live with

5

Mickey in October 2021. Jennifer stated that she was looking for work, but she had not been able to find a job. She testified that she had not applied for unemployment benefits or any type of public assistance, explaining that she had not done so because she was looking for a job. When asked what she was using to cover her living expenses, Jennifer testified that she was living off the proceeds of a tax refund. Asked about her future plans for employment, she replied, "I'd like to go back to school, whether it's to go to work full-time and school part-time or school full-time and work part-time, either way. I'd like to pick up where I left off."

¶ 20 Jennifer was asked about her living arrangements after the parties separated. She stated that she initially stayed in the camper on the property at 3200 Mick English Road, but that she moved the camper to her father's property sometime in late June or early July of 2021. She testified that she moved because a confrontation with Mickey made her feel unsafe. According to Jennifer, Mickey told her that it was his property and that he could do whatever he wanted with anything on the property—including moving the camper she was living in. Asked about the condition of the camper, Jennifer stated, "It's pretty good." She noted, however, that the camper had some water damage. When asked about the value of the camper, she stated that she did not know how much it was worth, but she estimated that it was worth between $5000 and $7000.

¶ 21 Mickey testified that at the time of the hearing, he worked for A&W Plumbing and was paid $45.50 per hour, a significant increase over the $25 per hour he earned in his previous position. He noted that the number of hours he worked fluctuated. He testified that he earned $51,587.45 in 2020. The record contains a W2 showing that Mickey earned $58,650.72 from A&W Plumbing in 2021.

¶ 22 When asked why Jennifer decided to stop attending college, Mickey indicated that she told him she wanted to stay home with the children because daycare was too expensive on his income

at the time. He acknowledged that he agreed with her decision. Unlike Jennifer, he testified that their plan was for her to either get a job or go back to college once all four children were in school. According to Mickey, however, when the children were all in school, Jennifer told him that she wanted to continue to stay home so she would be available if anything happened to them during the workday. When asked how he responded, Mickey stated, "Pretty much told her, 'Hun, if that's the way it's going to be, that's the way it's going to be,' is basically the way it went down."

¶ 23    Mickey was asked about the condition and value of the camper. He testified that before the parties separated, he made some repairs to the camper, including putting on a new roof. He admitted, however, that "it did have a bit of water damage to it." He estimated the value of the camper to be approximately $10,000. He explained that he looked at similar used campers online that were selling for that amount, and he believed that it represented a fair approximate value. He acknowledged, however, that he did not know how much the camper was worth in its condition.

¶ 24    Mickey also estimated the value of various pieces of personal property owned by the parties, including a car hauler, vehicles, and a horse. (We note that, although Jennifer asked for temporary possession of two horses, only one horse was involved by the time of the hearing. It is unclear whether the second horse died or was sold.) Mickey contended that Jennifer took everything of value from the property when she left, but he did not explain what she took other than the camper, the horse, and a vehicle.

¶ 25    Mickey disputed Jennifer's version of the confrontation that occurred during the summer of 2021 before Jennifer left the property. According to Mickey, he called his adult son, Michael, to let him know that he would be coming to the property to pick up the car hauler, but when he arrived, a car was parked in front of the car hauler, and he was told that he was not allowed to take anything from the property. He testified that a "screaming match" ensued, but he was eventually

7

able to take the car hauler and one of the parties' vehicles. He stated that those were the only items he took from the property.

¶ 26    Mickey's testimony concerning the parties' acquisition of the property likewise differed from Jennifer's. He testified that they did not pay his father anything for the property. He noted that it was a portion of a larger piece of property his father owned. Mickey testified that to build the house on the property, they cut trees that were growing on the property and bought approximately $6000 in materials, including lumber. According to Mickey, they did not use any materials from Jennifer's trailers, which were torn down when they became uninhabitable. Mickey testified that after the parties were separated, he purchased "sheet rock and stuff like that" to complete the house.

¶ 27    At the time of the hearing, Mickey was living in a house on 3200 Mick English Road. He did not know the value of the property with the home, but he estimated that the land itself was worth approximately $2000 per acre.

¶ 28    Mickey testified that the parties had financial difficulties throughout the marriage. He stated that they did not have any savings. He acknowledged, however, that he previously had $3400 in a retirement account from Ivitt's Plumbing Contractors, one of his previous employers. He further acknowledged that he had liquidated that account to pay his own attorney fees.

¶ 29    The only other witness to testify was Matthew English. He estimated that the property at 3200 Mick English Road had been in his family for 55 years. Matthew inherited 29 acres from his father, which was part of a larger property that had been owned by his father. Matthew testified that he and his two brothers each inherited one-third of their father's property. He further testified that he conveyed much of his 29-acre property to his three children, including Mickey, while he was going through a divorce. He explained that he kept a 12-acre parcel that included a house and

8

divided the remainder equally among his three children. Asked why he conveyed the property to Mickey and Jennifer in the deed, Matthew replied, "They was married. I mean I just—they was married at the time." On cross-examination, Matthew acknowledged that he intended to convey the property to Mickey and Jennifer as husband and wife.

¶ 30    The parties then presented arguments to the court. Jennifer's attorney began by arguing that 3200 Mick English Road was marital property. The court interrupted, stating, "It's marital property." The court went on to state, "The question is, the question is what percentage of division should the court make in, you know, one of the things the court can consider is, you know, where the property came from, you know." Counsel acknowledged that the property had been in Mickey's family "for generations," but emphasized that it was deeded to them as husband and wife and that Jennifer contributed to the upkeep of the property by being a homemaker.

¶ 31    Noting that the record contained no evidence concerning the value of the property, counsel requested that the court order an appraisal and sale of the property and an equitable distribution of the proceeds. The court again interrupted and stated as follows: "I'm not selling property that's been in his family for 55 years. That's not going to happen. Now, the court can make an equitable distribution and maybe require him to contribute something to her, but I'm not selling the property."

¶ 32    Counsel went on to argue in favor of an award of maintenance to Jennifer. He emphasized that the parties had a 17-year marriage during which Jennifer had stayed home to care for the children while Mickey worked and increased his earning potential. He further argued that Jennifer was currently unemployed and had no means of supporting herself, much less supporting herself at the standard of living established during the marriage. Noting that "there are more jobs available

9

today than there has been in the last 25 years," the court indicated that it might impute income to Jennifer.

¶ 33    Mickey's attorney argued that Mickey should not be required to pay maintenance. She stated that it was "clear that Ms. English is voluntarily unemployed." Counsel further argued that the standard of living established during the marriage was "very low."

¶ 34    The court directed Mickey to provide documentation of his current income within 10 days. The court then took the matter under advisement.

¶ 35    On June 1, 2022, the court issued a docket entry containing its findings. In pertinent part, the court found that Mickey's net income was $5327.46 per month and that a net income of $1514 per month would be imputed to Jennifer. Based on these findings, the court ordered Mickey to pay Jennifer maintenance in the amount of $1315.93 per month for a period of 148 months and ordered Jennifer to pay Mickey $461.99 per month in child support for McKenzie. The court further found that the property at 3200 Mick English Road was marital property. The court ordered the parties to sell the property at public auction by July 16, 2022, and to divide the proceeds equally unless they could settle the issue before that time. The court divided the remaining marital property between the parties according to their agreement, including their vehicles, their pets, Mickey's pension, and the camper. The court also awarded parenting time with McKenzie in accordance with their agreement. The court ordered both parties to pay their own attorney fees.

¶ 36    On July 6, 2022, the court entered a final judgment of dissolution containing the same findings. Mickey then filed this timely appeal.

¶ 37                                    II. ANALYSIS

¶ 38    Mickey raises three arguments on appeal. First, he contends that the court erred by accepting and proceeding on a petition for dissolution in which Jennifer made inaccurate

10

statements. Specifically, he complains that she inaccurately alleged that four children were born to the parties, no children were adopted, and two children were minors. As discussed earlier, only one child was born to the parties, three children were adopted by Mickey, and only one child was still a minor when Jennifer filed her petition, although two were minors when the parties separated. Second, Mickey argues that the court abused its discretion by awarding Jennifer maintenance. Third, he argues that the court abused its discretion by finding the property at 3200 Mick English Road to be marital property. We reject each of these contentions.

¶ 39　　　　　　　　A. Accepting and Proceeding on the Petition for Dissolution

¶ 40　In support of his argument that the court erred or abused its discretion in accepting and proceeding on Jennifer's petition, Mickey cites section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2018)). That statute provides, in pertinent part, that "[a]ny person who makes a false statement, material to the issue or point in question, which he does not believe to be true, in any pleading, affidavit or other document *** shall be guilty of a Class 3 felony." *Id.* Mickey argues that Jennifer "should be held accountable for her actions." He further asserts that she "on multiple counts lie[d] to the court."

¶ 41　In response, Jennifer contends that the errors in her petition were insignificant and were corrected by the trial court. She further contends that, to the extent Mickey is arguing that she lied to the court "on multiple counts" in her trial testimony, the credibility of witnesses is a matter to be resolved by the trial court. In his reply brief, Mickey takes issue with the notion that the errors in Jennifer's petition were harmless or insignificant, asserting that the inaccuracies undermined her credibility as a witness. We agree with Jennifer that any inaccuracies in the petition were insignificant.

11

¶ 42    There is no legal significance to the fact that Mickey adopted the parties' three adult children or the fact that they were not born to the parties during the marriage. It is also worth noting that at the hearing, Jennifer accurately testified that only one child was born to the parties and that Mickey adopted her three older children. Mickey also challenges Jennifer's allegation that she wanted custody and child support for two minor children, even though only the parties' youngest daughter was a minor. As we have already discussed, the parties' second youngest child, Victoria, was a minor when the parties separated in February 2020, but she turned 18 before Jennifer filed her petition for dissolution. However, Jennifer was never awarded temporary or permanent custody or child support for Victoria. Thus, this mistake did not have any impact on any issues resolved by the court.

¶ 43    Mickey further contends that these minor inaccuracies demonstrate that Jennifer was "not a credible witness." However, resolution of inconsistencies in the testimony of witnesses is a matter for the court to resolve. That court is in a better position than we are to judge the credibility of witnesses and resolve conflicting evidence. *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 35. We find no error in the court's decision to accept and proceed on Jennifer's petition for dissolution.

¶ 44                                B. Maintenance

¶ 45    Mickey next argues that the court abused its discretion in awarding Jennifer maintenance. We reject his contention.

¶ 46    A trial court's determination regarding the propriety of awarding maintenance is "within the sound discretion of the trial court." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 650 (2008). Thus, the court's decision is presumed to be correct, and we will not overturn a maintenance award absent an abuse of the court's discretion. *Id.* It is Mickey's burden, as the party challenging the

12

maintenance award, to demonstrate that the court abused its discretion. An abuse of discretion occurs when "no reasonable person would take the view adopted by the trial court." *Id.* at 651.

¶ 47 Maintenance awards are governed by section 504 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504 (West 2018)). *Id.* That statute sets forth factors for the court to consider in making its determination. No single factor is determinative. *Id.* Relevant factors in this case include: (1) the income and property of each party, including marital property assigned to the party requesting maintenance (750 ILCS 5/504(a)(1)); (2) the needs of each party (*id.* § 504(a)(2)); (3) any impairment of a party's present and future earning capacity because that party devoted time to domestic duties or "delayed education, training, employment, or career opportunities due to the marriage" (*id.* § 504(a)(4)); (4) the standard of living established during the marriage (*id.* § 504(a)(7)); and (5) the length of the marriage (*id.* § 504(a)(8)).

¶ 48 Here, the duration of the parties' marriage was relatively lengthy, at 18 years. Even after imputing income to Jennifer, the court found that Mickey earned significantly more income than Jennifer. The court distributed most of the marital property pursuant to the parties' agreement and did not make any findings as to the value of that property; however, the limited evidence presented as to the value of marital assets indicates that with the exception of 3200 Mick English Road and possibly Mickey's retirement account, neither party had any particularly valuable assets. Significantly, the evidence established that Jennifer's earning potential was limited by the time she devoted to domestic duties. Although the parties offered differing testimony concerning the decision for Jennifer to delay the completion of her education, it is undisputed that the parties agreed that she would remain home with the children for at least a few years. These factors weigh in favor of an award of maintenance.

13

¶ 49    Mickey argues, however, that Jennifer does not "qualify" for maintenance for several reasons. First, he argues that maintenance was inappropriate because Jennifer was "voluntarily unemployed" at the time of the hearing. As we have already discussed, the court appeared to accept this argument, and it imputed income to Jennifer as a result. As we also already discussed, even considering the income imputed to Jennifer, Mickey's income was substantially higher than hers. Next, he asserts that Jennifer lived with Jessie and Cheryl Atwood (presumably family members), who also contributed to household bills. However, he presented no evidence in support of this claim to the trial court. Mickey further asserts that Jennifer was awarded the most valuable marital asset. Presumably, he is referring to the camper. However, neither party presented evidence as to the value of the camper aside from their own unsupported opinions. Moreover, it is unclear how the award of an 18-year-old water-damaged camper had any meaningful impact on her need for maintenance.

¶ 50    Finally, Mickey argues that Jennifer should not have been awarded maintenance because she was already maintaining the "very low" standard of living established during the marriage. He asserts that the camper was her residence both during the marriage and after the parties separated. There are two key flaws with this argument. First, the parties presented very little evidence concerning the standard of living established during the marriage, including what they used as a residence when they lived together on the property at 3200 Mick English Road. Mickey testified that he completed the house after the parties were separated, and both parties testified that at some point, the double-wide trailer they had lived in was dismantled. Second, even assuming they lived in the camper, as Mickey asserts, "there is more to the standard of living established during the marriage than living in a specific building." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 104. Mickey testified at trial that his income from Ivitt's Plumbing Contractors in 2020,

14

when the parties separated, was $51,587.45 per year, or $4298.95 per month. The court imputed a net monthly income of $1514 to Jennifer, which was reasonably close to the $1790 per month she reported earning in the financial affidavit she filed in the summer of 2021. Clearly, the standard of living enjoyed in a household with an income of nearly $4300 per month is substantially higher than the standard of living available to a household with an income of less than $1800 per month. We find no abuse of discretion in the court's decision to award maintenance.

¶ 51                                   C. 3200 Mick English Road

¶ 52    Mickey's final argument is that the court erred in finding 3200 Mick English Road to be marital property. We disagree.

¶ 53    Marital property includes all property acquired by either party during the marriage with certain statutory exceptions. 750 ILCS 5/503(a) (West 2018). Pertinent to this appeal, property acquired by one spouse through gift, legacy, or descent is nonmarital property. *Id.* § 503(a)(1).

¶ 54    Property acquired during the marriage is presumed to be marital property, a presumption which can only be overcome by presenting clear and convincing evidence that the property falls within one of the statutory exceptions or was jointly acquired for estate or tax planning purposes. *Id.* § 503(b)(1). However, a transfer of property from a parent to a child is presumed to be a gift. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 46. Where property is subject both to this presumption and the presumption that it is marital property because it was acquired during the marriage, the presumptions "cancel each other out, and the trial court is free to determine the issue of whether the asset in question is marital or nonmarital without resort to either presumption." *Id.*

¶ 55    Any doubts concerning the character of property are to be resolved in favor of finding it to be marital. *Heroy*, 385 Ill. App. 3d at 670. We will not reverse a trial court's classification of property as marital or nonmarital unless the court's determination is against the manifest weight

15

of the evidence. *Id.* at 669. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the court's decision is arbitrary, unreasonable, or not based on the evidence. *Id.*

¶ 56    Mickey argues that 3200 Mick English Road is "legacy property" and is, therefore, not marital. As Jennifer correctly contends, however, a legacy is "a testamentary disposition of real or personal property." 755 ILCS 5/1-2.12 (West 2018). The property at issue here was conveyed to Mickey and Jennifer by Matthew English during his lifetime, not by testamentary disposition. We thus reject Mickey's contention that he received the property through a legacy.

¶ 57    This conclusion does not resolve the question, however. As we mentioned earlier, property acquired by gift is another exception to the rule that property acquired during the marriage is marital property. See 750 ILCS 5/503(a)(1) (West 2018). Here, the parties offered conflicting testimony concerning payment for the property. Jennifer testified that they paid Matthew eight dollars for the property, or one dollar per acre, while Mickey testified that they did not pay anything for the property. We find that the property was a gift from Matthew. Assuming Jennifer's testimony is true, one dollar per acre is a token payment. Moreover, as stated previously, property conveyed from a parent to a child is presumed to be a gift. *Romano*, 2012 IL App (2d) 091339, ¶ 46. The question, then, is whether it was a gift to Mickey alone or a gift to Mickey and Jennifer as a couple.

¶ 58    A gift from a parent can be either a gift to the couple or a gift to one of the parties alone. If an asset is a gift to the couple, it is marital property. If it is a gift to only one of the parties, it is nonmarital property. *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 968-69 (1993); see also *In re Marriage of Sanfratello*, 393 Ill. App. 641, 651-52 (2009) (explaining that the husband's parents "were free to gift the home, built as the home for the newlyweds" to both the husband and wife,

16

but finding it unnecessary to resolve this question). Here, 3200 Mick English Road was conveyed to Mickey and Jennifer English as husband and wife, and there was no evidence presented that Matthew intended the conveyance as a gift to his son alone.

¶ 59 Moreover, placing title to nonmarital property in joint tenancy with both spouses creates a presumption that it was intended as a gift to the marital estate, as does using marital property to improve nonmarital property. *In re Marriage of Johns*, 311 Ill. App. 3d 699, 703 (2000). Here, although Mickey now asserts that Jennifer contributed nothing to building the home on the property, it is undisputed that the parties purchased some of the materials used to build it during the marriage, and there was no evidence that those materials were purchased using nonmarital funds. Finally, even assuming the property was initially intended as a gift to Mickey alone, the fact that he and Jennifer lived on the property as their joint home for over six years and used marital funds to pay for its upkeep is sufficient to "transmute" the property into a marital asset. See *Sanfratello*, 393 Ill. App. 3d at 652. We conclude that the court's decision to classify 3200 Mick English Road as marital property was amply supported by the evidence.

¶ 60                                                III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the trial court's judgment.


¶ 62    Affirmed.