NOTICE
Decision filed 01/16/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250030-U

NO. 5-25-0030

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SHELLEY NICOLE FRITCH, | ) | Jefferson County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 18-D-118 |
| | ) | |
| KURTIS DUANE FRITCH, | ) | Honorable |
| | ) | Sonja L. Ligon, |
|     Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Hackett concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's order denying respondent's motion for summary judgment is affirmed where a question of fact remains as to whether petitioner benefited from the original marital settlement agreement. The trial court's order granting petitioner's motion to vacate the judgment is reversed where petitioner failed to meet her burden under section 2-1401 of the Illinois Code of Civil Procedure and section 502(b) of the Illinois Marriage and Dissolution of Marriage Act.

¶ 2   Respondent, Kurtis Fritch, appeals the trial court's order denying his motion for summary judgment and granting petitioner, Shelley Fritch's, motion to vacate the previously filed judgment and marital settlement agreement (MSA) incorporated therein. For the following reasons, we affirm in part, and reverse in part, the trial court's orders.

1

¶ 3                                  I. BACKGROUND

¶ 4     On September 19, 2018, Shelley filed a petition for dissolution of marriage after 18 years of marriage. Three children were born during the marriage: Kenneth (14 years old), Samantha (11 years old) and Charlie (9 years old). The petition's prayer for relief requested that a judgment of dissolution be entered and the court approve the MSA and joint parenting agreement (JPA). A stipulation stating the grounds for dissolution and waiver of the two-year waiting period, along with a proposed JPA that provided both parents with approximately equal custody and parenting time was also filed. Kurtis filed an entry of appearance and waiver of notice that stated he executed a proposed judgment which he approved as to the form and substance and an MSA and JPA dated September 18, 2018. His pleading requested the court approve both.

¶ 5     On November 8, 2018, Shelley filed the MSA executed on September 18, 2018. Pursuant to the MSA, the parties would share joint custody of the children and neither party would pay child support. The MSA split the cost of any extracurricular activities, allowed each parent to take one child for tax purposes and annually alternate the third child for tax purposes. The MSA also split any medical bills that were not covered by insurance, waived maintenance, and assigned debt to Kurtis related to a 2008 Chevy Suburban, two Wells Fargo credit cards, a Menards credit card, and consumer collection management. Shelly was assigned the Capital One and Cardmember Services credit card debt. She was awarded her personal effects, her pension plan, and the 2008 Chevy Suburban. Kurtis was awarded his personal effects, his retirement plan, a 2005 Chevy Suburban, a 2003 Ford F-350, a 1979 Chevy pickup, and the property at 4983 Bible Grove Lane in Louisville, Illinois. The MSA also limited modification to child support, custody, and visitation pursuant to section 502(f) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/502(f) (West 2016)).

2

¶ 6 On November 8, 2018, a hearing was held before Judge Neubauer. Shelley appeared *pro se*. Kurtis did not appear. Following the hearing, the circuit court entered a judgment for dissolution of marriage that incorporated the MSA and JPA.

¶ 7 On August 8, 2019, Shelley obtained counsel and filed a petition to establish child support. The petition alleged that Kurtis was gainfully employed, had not paid child support or provided financial help, and that Shelley was the primary caretaker for the children. The petition also requested, since Kurtis had not paid child support, that Shelley receive the tax dependency exemptions every year and that Kurtis be required to maintain health insurance on the children and pay all or a significant portion of any medical bills not covered by health insurance. The petition further alleged that material and substantial changes in circumstances justified the immediate modification, stating that: (a) Kurtis was and continued to be gainfully employed on a full-time basis and was able to contribute toward the support of the minor children; (b) at the time of the original JPA the minor children were almost a year younger and since then the minor children had grown older and their cost of living had risen, stating that expenditures for their support, including, but not limited to, clothing, food, activities, school expenses, etc., had substantially increased; (c) the parties never followed the intended shared equal physical custody schedule and the children attended school in the Mt. Vernon school district in which Shelley resided while Kurtis continued to reside in Louisville, Illinois; (d) Kurtis had an increased ability to pay as his income had substantially increased since the JPA was entered; and (e) Shelley needed to retain counsel in the instant proceedings and was unable to pay said attorney, but that Kurtis could make those payments as well.

¶ 8 In addition to the petition to establish child support, Shelly also filed a petition to vacate the judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-

1401 (West 2018)) and section 502(b) of the Act (750 ILCS 5/502(b) (West 2018)). In count I, Shelley alleged that the MSA was unconscionable because she received nothing but debt and a vehicle and received none of the "marital property" that was paid off. She further alleged that Kurtis was making $80,000 a year, and she had no job prior to the divorce and now had a low paying job requiring her to reside in public housing. Count II alleged the MSA was fraudulent and that Kurtis hid his total income and his retirement accounts. Count III alleged coercion and duress and claimed that Kurtis led Shelley to believe that he would continue to support her despite the terms of the MSA. An affidavit restating the allegations was attached to the motion. On October 8, 2019, Kurtis obtained counsel and filed responses denying the essential facts at issue.

¶ 9     On November 12, 2019, Kurtis and Shelley filed a joint motion to amend the JPA. The joint motion stated that Kurtis had legal custody of the children, the children resided with Kurtis, and the children used his residential address for purposes of school enrollment. The motion requested that all other terms of the JPA remain in full force and effect. The motion was approved by order dated November 15, 2019.

¶ 10    On July 8, 2020, the circuit court indicated it would hear the petition to establish child support first and later address the petition to vacate. A hearing on the petition to establish child support was held on September 25, 2020. According to the docket sheet, both parties testified, and the matter was taken under advisement. No copy of this transcript was included in the record on appeal. On October 23, 2020, the court orally granted the petition after finding a substantial change in circumstances.

¶ 11    On December 1, 2020, the court issued a docket entry ruling that listed Shelley's current unemployment and on-going financial hardship as the bases for finding a substantial change in circumstances. It further found that Shelley's unemployment was due to COVID-19 and remote

4

learning issues with the children. The docket entry stated that the equal parenting time schedule was not strictly followed by the minor children. The court admitted it did "not have a precise calculation" of nightly visits and therefore used 219 nights for Shelley for one child and 146 nights for the other two children. The court awarded Shelley monthly child support in the amount of $1,077.75 from August 2019 to July 2020 and stated that child support would increase to $1,280.56 commencing in August 2020.

¶ 12　On May 7, 2021, Kurtis filed a motion for summary judgment. The motion alleged that Shelley filed the petition for dissolution along with the JPA on September 19, 2018, and on November 8, 2018, Shelley filed the MSA and proposed judgment and also appeared before Judge Neubauer. It noted that the MSA addressed child support and provided reasons why neither party would pay it. It noted Shelley's 2018 and 2019 federal tax returns in which Shelley claimed head of household status, which provided a substantial tax refund. It further noted that the parties modified the JPA on November 15, 2019, and acknowledged the validity of the remaining portions of the judgment at that time. Kurtis's motion relied on case law that stated that a person who accepted the benefit of a dissolution judgment was estopped from later seeking to vacate the judgment.

¶ 13　On September 8, 2021, the court issued an oral ruling denying Kurtis's motion for summary judgment. The court stated,

> "The motion references child support, Petitioner's filing of tax returns, receipt of assets assigned in the Marital Settlement Agreement, and a modification of the Joint Parenting Agreement entered on November 15, 2019 as benefits of the Judgment of Dissolution of Marriage accepted by Petitioner; the issue being that a

5

person who has accepted benefits of a dissolution judgment should not be permitted to challenge the validity of said judgment."

The court addressed the cases cited by Kurtis, the arguments presented by both sides, found the assignments in the MSA were not dispositive of the benefits issue. It found no precedent for Kurtis's claim "that filing a tax return under which Respondent claimed head of household status would estop her from challenging" the judgment's validity because Shelley was "required by law to file tax returns." The court also found no precedent that stated receiving child support would "estop a party from challenging a dissolution judgment" or that modifying a JPA constituted a benefit that estopped a challenge of the dissolution judgment. As such, the court denied Kurtis's motion for summary judgment.

¶ 14     On October 4, 2023, Kurtis filed a petition for modification. It noted the current child support obligation of $1,280.56 and claimed that a substantial change of circumstances concerning the children and the financial resources of the parties occurred. Notably, the oldest child was now 19 years old and had resided with Kurtis since he turned 18. It further alleged that Shelly had increased income and could contribute to the support of the remaining children. The petition requested the modification be retroactive to February 24, 2022, when the oldest child turned 18.

¶ 15     Correspondence from Kurtis's attorney to the court dated November 22, 2023, indicated that based on the continued 2/2/3 shared parenting time schedule,[1] and Shelley's updated pay stubs, Shelley had 183 overnight visits with the children and child support should be $564.72 per month. On November 27, 2023, Shelly filed a response to the petition and admitted everything therein

---

[1] A 2/2/3 shared parenting schedule allows the first parent to have the child[ren] for two days, then the second parent get the child[ren] for two days, with the first parent then having the child[red] for three days. The schedule then flips with the second parent getting the first two days, the first parent getting the next two days, and the second parent getting the next three days.

except that her financial resources substantially increased. She asked the court to deny the petition. She filed a child support calculation requesting $1,487 per month and claimed the parties were not sharing physical custody.

¶ 16    A hearing on Kurtis's petition to modify was held on November 28, 2023. Following the hearing, the court took the matter under advisement and Shelley's attorney sent correspondence confirming that $5,533 was withheld from Kurtis's tax return and that Kurtis remained in arrears for $12,737. The correspondence requested the court deny Kurtis's petition to modify until he was current with his child support payments.

¶ 17    A hearing on the pending motions was held on December 1, 2023. The court addressed the petition for modification first and noted that the oldest child was now 19 years old, had resided with Kurtis since February 24, 2023, and Shelley's income had increased. The court further noted that on November 28, 2023, both parties testified that they followed a 50/50 parenting time schedule of 2/2/3. The court relied on the sworn testimony and agreed with allotting 183 overnight visits to Shelley for child support purposes. The court found there was insufficient evidence related to Shelley's expenses to validate a deviation or to dismiss the petition for modification. The court noted that both parties initially agreed that if the court used a 50/50 parenting time schedule, the child support payment would be the amount set forth in the November 22, 2023, correspondence ($564.72 per month). The court reviewed that calculation, accepted that calculation, granted the petition for modification, and set the amount of child support at $564.72 per month. The court ordered that overpaid child support be applied to any retroactive amount owed, if any was owed.

¶ 18    The court then moved forward with the hearing on the petition to vacate the judgment. Shelley testified that she currently lived in a rental home in Mt. Vernon, Illinois, and worked for Vonachen Group beginning on August 1, 2023. She stated that she had minimal employment

7

during the marriage so she could take care of the children but held part-time employment during the marriage that included driving a school bus and working in an ice cream shop. She testified that the parties moved into the marital home in Louisville, Illinois, approximately six months after they were married and lived there together until she left in June 2018. They purchased the home and surrounding acreage for $36,500 and paid off the house approximately 10-15 years later. Shelley stated that after she left the marital home in June 2018, she lived with her parents for about a month, and found work in a nursing home, where she initially worked as a dietary aide and then became dietary manager during the two years she worked there. She reviewed the jointly filed 2017 tax return and explained that someone farmed the surrounding acreage who received two-thirds of the profits, while she and Kurtis received one-third of the profit.

¶ 19　As to the November 8, 2018, MSA, Shelley testified that neither she nor Kurtis had legal representation for the divorce. She received a copy of her friend's MSA and plugged information into the document. She agreed that the document stated that both parties "freely and voluntarily entered into this agreement" and were "free of duress and coercion" and she filed a petition to vacate the judgment approximately 10 months after the judgment was entered that disputed those statements. She further agreed that the petition alleged that the MSA was unconscionable and that she was the author of the MSA. She admitted the document stated that it was a "written expression of the oral agreement heretofore entered into between the parties." She stated that it was her understanding that it did not matter what the divorce documents stated because Kurtis "would still help the children" and her.

¶ 20　Shelley testified that she and Kurtis discussed the marital home, and it was her understanding that the marital home would be sold at a later date, and they would divide the proceeds between them. She planned to use those proceeds to obtain a home for her and the

8

children. Shelley stated that did not occur and the marital home was currently vacant. She stated that she had no idea what inchoate rights, homestead rights, community interest, surviving spousal award, maintenance, or alimony meant. She regretted copying the original document and plugging in the necessary information stating she did not know the law at the time she prepared the document. She agreed that she was employed at the time she executed the document.

¶ 21 Shelley testified that she asked for Kurtis's financial assistance after she moved out of the home but did not receive it very often. She averred that the Capital One credit card was still maxed out, but the Card Member Services credit card no longer existed. She obtained all of her personal effects from the house and also took some furniture, the washer and dryer, a TV, a stove, and refrigerator. She no longer had a pension plan so that information, as set forth in the MSA, was incorrect. She believed the house was currently worth $40,000.

¶ 22 Shelley testified that the dissolution documents were signed on September 18, 2018, and she had them for three weeks before she went to court with them. She stated that she only filed the divorce paperwork because the State of Illinois would not help her if she was married. She agreed that she was receiving food stamps and a medical card when she filed the divorce paperwork. She stated that loan payments were due on the 2008 Chevy Suburban at the time of the divorce, but the vehicle was now paid off. She valued the vehicle as $13,810 but stated it stopped running four or five months previously and was sitting in her backyard. She stated that she and Kurtis discussed his 401(k) account, but she did not understand it except that it could not be accessed except for hardship or changed employment. She had an "idea of its value" but not an exact dollar amount. She believed it had $100,000 or a little more and admitted occasionally seeing statements for the account. She believed the divorce would trigger the hardship clause and that the 401(k) would then be divided. She stated that she did not ask to see any documents because Kurtis told her that he

would take care of them. She admitted that she also knew that Kurtis had a pension at the time of the divorce but stated she did not understand the pension.

¶ 23    Shelley stated that she filed a petition for a waiver of fees on November 7, 2018, and believed that when she went to court on November 8, 2018, it was that petition that would be addressed. She testified that she had no idea the judgment would be entered that day but "it really would not have made much of a difference anyway." She stated that Judge Neubauer filled out the judgment based on her responses to questions he asked that day. She testified that she no longer qualified for public aid based on her employment wages and receipt of child support.

¶ 24    She stated that Kurtis remained employed at the same place where he worked throughout the marriage and his employment was in Champaign, Illinois. She averred that Kurtis usually was gone 12 hours a day with the two-hour drive each way; however, when he was not working, he helped a friend with farming and also worked as a volunteer firefighter. Shelley was asked why she was asking the court to vacate the judgment and said, "for fairness, equalness." She stated that she did not understand any of the terms in the settlement agreement or the divorce and was "not of stable mind at that time." She stated that she had never lived on her own, much less with three children, and had no idea what she was going to do after she was thrown out of her parents' home before the divorce was final. She stated that her emotional issues stemmed from being alone. She testified that she was coerced into the agreement because it was her understanding that Kurtis would still take care of everything she needed, would move to Mt. Vernon, sell the house, and divide the profits. She further stated that she believed that Kurtis could not access his 401(k) unless there was a hardship. She stated that she relied on those statements when she entered the settlement agreement and regretted it now.

10

¶ 25    On cross-examination, Shelley was asked what coercion meant, and stated, "I don't know the definition of coercion." When she was reminded of her previous answers at the hearing, she stated that she "entered the agreement falsely under false terms" and "was manipulated into entering into something." She stated that unconscionable meant "unequal" or "unfair." She agreed she "could have looked up a lot of information in the dictionary if I was of clear mind" in 2018. She agreed that she was on the joint bank account with Kurtis for quite some time after the judgment was entered, drove up to the Louisville, Illinois, bank after acquiring an attorney and removed all of the funds in the joint account except for $12. She admitted that she prepared the parties' 2017 and 2018 tax forms.

¶ 26    On redirect, Shelley stated that she realized the MSA was unconscionable after everything was finalized and Kurtis would no longer cooperate with the oral agreement. She stated that the document potentially would not have been unconscionable if the oral agreement had continued. Shelley could not recall how much money she took from the joint account but stated it did not "have the value of the 401(k)."

¶ 27    On recross-examination, Shelley read paragraph 9 of the MSA which stated, "Whereas, husband and wife have declined to obtain attorneys and the wife has drafted this instrument and this instrument purports to be and in fact is a written expression of the oral agreement heretofore entered into between the parties." She disagreed that she was lying when she signed the document and stated she did not understand the document. When asked which word she did not understand in that paragraph, Shelley stated, "I understand the words in paragraph 9, sir." She stated that the legal documents did not matter because Kurtis said he would still help her. Shelley rested at that time and Kurtis moved for judgment which was denied.

11

¶ 28 Kurtis testified that he never promised Shelley that he would sell the house in Louisville, Illinois, and give her one-half of those proceeds, or one-half of his 401(k). He stated that he never prohibited Shelley from obtaining a lawyer when she was preparing the MSA. He further stated that the language in the MSA language was what Shelley wanted it to say. On cross-examination, Kurtis stated that the discussion on the house was exactly what was in the MSA, *i.e.*, he was to keep the house and pay off all the debt. Following cross-examination, Kurtis's counsel rested.

¶ 29 Shelley's attorney then moved to reopen her case-in-chief and called Kurtis as a witness. Kurtis testified that he currently resided in Waltonville, Illinois, and had moved from the marital home. The marital home was currently vacant, but the surrounding property continued to be farmed; the property was sharecropped and he received one-third of the income. He had a mortgage on his new home that was purchased for $132,000. Debt remained on the mortgage as well as the loan he took for the down payment. He continued to work for the same company for the last 22 years. He believed his current income would be less than the $91,000 listed on the 2018 taxes. He agreed that his 401(k) held $154,480.77 as of May 22, 2020, and as of October 2023 had a value of $200,221.28. He stated that Shelley was aware of the pensions and the 401(k) when she prepared the MSA. They discussed getting money out of his 401(k) but when Kurtis contacted the fund manager, he was told that was not possible. The fund manager told him the only way he could reach the money in his 401(k) was to quit his job and not work in his field for a year. When they found out the funds could not be removed, Shelley dropped the issue.

¶ 30 Kurtis agreed that Shelley was the primary caretaker of the children when they were married and spent a lot of her time taking care of domestic duties in the home. He did not know how much he would get from his pensions when he retired. He did not prepare the MSA and was not in control of what was put in the document. He signed the document believing he entered into

12

a legally binding agreement, and it was his understanding that Shelley was fine with the agreement, because she wrote it.

¶ 31    On cross-examination, Kurtis testified that part of Shelley's household duties included keeping track of the bank statements, records from his employment, pension statements, and the 401(k) statements. She opened the mail that came to the house and read the documents. She also prepared their tax returns and had copies of his tax information. Kurtis stated that Shelley had as much knowledge about the marital assets as he did and he never hid anything from her or threatened her when they discussed the MSA. There were discussions, she prepared all the paperwork, and she then presented the documents to him for his signature. When she gave him the paperwork, and he had not signed within a week, Shelley told him to hurry up. He agreed that Shelley had access to the joint account after they divorced. He stated there was nothing that prevented Shelley from researching terms on the internet or consulting with an attorney when she was preparing the documents. After Kurtis's testimony, Shelley's attorney rested and the parties submitted written closing arguments.

¶ 32    Closing arguments were filed on December 8, 2023, and December 11, 2023. On May 10, 2024, the court granted Shelley's petition to vacate judgment pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2022)) and section 502(b) of the Act (750 ILCS 5/502(b) (West 2022)). The docket entry further stated that the "agreed upon child support amount shall be considered temporary in nature." The order acknowledged Shelley's pleadings, prior agreement to the judgment, freedom to contract, and denials of duress, coercion, and statement that the terms were not unconscionable. However, the court took issue with the "marital estate" not including farmland, income from the farm, or the marital home, reliance on statements that were not included in the MSA, lack of knowledge about the retirement accounts, maintenance, and no child support.

13

The court also addressed the "prove up hearing," the results that stemmed from the MSA, and found that Shelley stated sufficient facts for a meritorious claim and showed due diligence, although, as to the latter, the court did "not encourage similar conduct."

¶ 33    The court found Shelley credible and stated that she "not only relied on out of court statements," including the inability to divide the retirement accounts, she sought a divorce to seek State benefits, not all facts were known or available to her because she was not in the house, she did not understand terms in the marital agreement, not all information regarding the real property were presented to the court, and inaccurate information was presented regarding child support including that they were both employed and able to care for the children. The court also noted that Shelley used a copy of a friend's MSA to her disadvantage "since there were substantial assets in this marital estate." The court found the agreement one-sided to Shelley's detriment, that Shelley met her burden after considering the statutory factors, and found the MSA was unconscionable.

¶ 34    Kurtis filed a motion to reconsider, and Shelly filed a response urging denial of the motion. On December 27, 2024, the court denied Kurtis's motion to reconsider, stating it found no "errors in the court's previous application of existing law." Kurtis appeals.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, Kurtis argues that the trial court erred in denying his motion for summary judgment and granting Shelley's petition to vacate the MSA. We first address Kurtis's argument regarding the denial of his motion for summary judgment.

¶ 37                         A. Motion for Summary Judgment

¶ 38    Motions for summary judgment are addressed in section 2-1005 of the Code. 735 ILCS 5/2-1005 (West 2022). Summary judgment is awarded when "the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

14

material fact and that the moving party is entitled to judgment as a matter of law." *Id*. § 2-1005(c). "A triable issue of fact exists where there is a dispute as to a material fact or where, although the material facts are not in dispute, reasonable minds might differ in drawing inferences from those facts." *Torrijos v. International Paper Company*, 2021 IL App (2d) 191150, ¶ 51 (citing *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007)). In evaluating whether a general issue of material fact or triable issue of fact exists, a court must construe the pleadings and evidentiary material "strictly against the movant and liberally in favor of the opponent." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). "Where doubt exists as to the right of summary judgment, the wiser judicial policy is to permit resolution of the dispute by a trial." *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 249 (1994). We review a court's decision on a motion for summary judgment *de novo*. *Village of New Athens v. Smith*, 2021 IL App (5th) 200257, ¶ 15. This means we give no deference to the trial court's decision but "consider anew the pleadings, affidavits, depositions, admissions, and exhibits on file to determine whether the trial court's decision was correct." *Jackson v. Graham*, 323 Ill. App. 3d 766, 779 (2001).

¶ 39    Kurtis's motion for summary judgment was based on Shelley's alleged acceptance of benefits from the MSA and cited *Grimm v. Grimm*, 302 Ill. 511 (1922), *Webb v. Webb*, 130 Ill. App. 2d 618 (1970) and *In re Marriage of Gryka*, 90 Ill. App. 3d 443 (1980) for the proposition that case law prohibits rejection of a contract after receiving benefits. Kurtis contends that Shelley already received a benefit from the agreement because she was able to claim head of household on her taxes and she received a $20,000 vehicle which Kurtis paid off pursuant to the MSA terms and therefore, she was estopped from now requesting modification of the same agreement.

¶ 40    Our review of the cited case law confirms that estoppel is relevant but inapplicable here. For example, in *Grimm*, the husband initially admitted being lawfully married to his second wife and was ordered to pay alimony to the second wife. *Grimm*, 302 Ill. at 512. When the husband failed to pay the alimony, a rule to show cause was issued and the husband argued that the second marriage occurred while he was still married to his first wife. *Id.* at 513. He argued that any award of alimony was improper because he was never lawfully married to the second wife, the court did not have jurisdiction to award alimony, and therefore the order was void. *Id.* at 512-13. The court found that the husband was estopped from making the voidness argument based on his initial admission of a lawful marriage and affirmed the finding of jurisdiction. *Id.* at 514.

¶ 41    In *Webb*, the husband was divorcing his first wife with whom he had three children. *Webb*, 130 Ill. App. 2d at 619. He originally filed a counter-petition but later abandoned the contest, a divorce was granted, and the parties agreed that custody of their three children should be awarded to the wife. *Id.* Issues of support, alimony, and property rights were reserved. *Id.* The husband later filed a petition to vacate the divorce decree claiming it was procured by fraud. *Id.* at 620. That petition was denied based on the statute of limitations. *Id.* A supplemental decree was later entered which determined maintenance and child support. *Id.* The husband continued to try to overturn the original divorce decree. *Id.* at 620-21. The appellate court denied the request finding that the husband's subsequent marriage and fathering another child with his new wife precluded him from reinstating any previous petition to vacate the divorce decree. *Id.* at 621-22 (quoting *McDonald v. Neale*, 35 Ill. App. 2d 140, 151 (1962), which found the remarriage dispositive of the issue). The benefit of being able to remarry was also the basis of the decision in *Gryka* where that husband also remarried and fathered a child with his new wife. *In re Marriage of Gryka*, 90 Ill. App. 3d at 446-47.

16

¶ 42    While undoubtedly, case law continues to preclude a party from challenging a previous divorce decree after that person accepts the benefits from that decree, we do not find the bases alleged by Kurtis to require estoppel. Notably, in all the cited cases, the action that triggered estoppel was one taken by the party trying to undermine the initial divorce decree. Here, Shelley's ability to claim a head of household federal tax exemption is based on federal qualifying requirements that require more than just being unmarried (see 26 U.S.C. § 2(b) (2024)), not the MSA. It is undisputed that Shelley was required to file federal taxes and no evidence was submitted, and no inference can be made, that Shelley filed for divorce from Kurtis so she could take a head of household tax exemption on taxes that she was required to file. As such, we find that any benefit related to the divorce and Shelley's ability to take the head of household tax exemption stemmed from the federal statute and is only collaterally related to the MSA. This is especially notable when Shelley's 2019 taxes, in which she first claimed head of household, included tax exemptions for all three of the parties' children, despite the MSA limiting each parent to one child, and alternating dependency status of the third child every other year.

¶ 43    Nor can we classify Shelley's receipt of the 2008 Chevrolet Suburban a "benefit" under the MSA. We agree that Kurtis paying the underlying debt on the vehicle pursuant to the MSA would appear to be a benefit to Shelley. However, Shelley testified at the hearing on her petition to vacate the judgment that the 2008 Chevrolet Suburban was no longer running and was instead, parked in Shelley's backyard. The MSA listed four vehicles as marital property. Shelley received only one. Given the condition of the 2008 Chevrolet Suburban at the time of the hearing, Shelley's receipt of only one vehicle is less of a benefit than originally shown. As such, the issue of whether Shelley's receipt of the 2008 vehicle is a benefit is a triable issue of fact better left for resolution in a trial. See *Jackson Jordan, Inc.*, 158 Ill. 2d at 249.

17

¶ 44   Finally, while Kurtis also contends that the parties' November 15, 2019, modification of the MSA estopped Shelley from challenging the MSA, no argument or citation of case law in support of this contention was provided. Accordingly, we find this issue forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."). As the first two bases underlying Kurtis's motion for summary judgment failed to provide sufficient support and the third was unargued, we hold that the trial court did not err in denying Kurtis's motion for summary judgment.

¶ 45                    B. Petition to Vacate Judgment

¶ 46   Kurtis's second issue contends that the trial court erred in granting Shelley's petition to vacate the judgment. Our standard of review for a court ruling on a petition to vacate a judgment is an abuse of discretion. *Gellert v. Jackson*, 373 Ill. App. 3d 149, 151 (2007). "[A]n abuse of discretion exists where no reasonable person would take the position adopted by the trial court [citation], or where the trial court acts arbitrarily, fails to employ conscientious judgment, and ignores recognized principles of law." *In re Commissioner of Banks and Real Estate*, 327 Ill. App. 3d 441, 476 (2001).

¶ 47   Shelley's petition to vacate the judgment was brought pursuant to section 502(b) of the Act (750 ILCS 5/502(b) (West 2022)) and section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2022)). Section 502(b) of the Act states,

> "The terms of the agreement, except those providing for the support and parental responsibility allocation of children, are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the agreement is unconscionable. The terms of the agreement

18

incorporated into the judgment are binding if there is any conflict between the terms of the agreement and any testimony made at an uncontested prove-up hearing on the grounds or the substance of the agreement." 750 ILCS 5/502(b) (West 2022).

While the language of section 502(b) seems to relate solely to the initial review of a proposed MSA, the language has been used as a basis to vacate a previous judgment incorporating an MSA. See *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 214 (1994).

¶ 48    Sections 2-1401(a) and (c) are used to vacate judgments that are more than 30 days old but less than two years. 735 ILCS 5/2-1401(a), (c) (West 2022). To obtain relief under section 2-1401,

" 'the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief.' " *In re Marriage of Harnack*, 2014 IL App (1st) 121424, ¶ 52 (quoting *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986)).

¶ 49    "Due diligence requires the section 2-1401 petitioner to have a reasonable excuse for failing to act within the appropriate time." *Airoom, Inc.*, 114 Ill. 2d at 222. "[S]ection 2-1401 does not afford a litigant a remedy whereby he may be relieved of the consequences of his own mistake or negligence." *Id.* Instead, the petitioner must show " 'that through no fault or negligence of his own, the error of fact or the existence of a valid defense was not made to appear to the trial court.' " *Id.* (quoting *Brockmeyer v. Duncan*, 18 Ill. 2d 502, 505 (1960)). "Specifically, the petitioner must show that his failure to defend against the lawsuit was an excusable mistake and that under the circumstances he acted reasonably, and not negligently, when he failed to initially resist the judgment." *Id.* "In determining the reasonableness of the excuse offered by the petitioner, all of

19

the circumstances attendant upon entry of the judgment must be considered, including the conduct of the litigants and their attorneys." *Id.*

¶ 50    Here we are presented with a unique situation in which the section 2-1401 petitioner claims that the same contract she drafted and presented to the circuit court for approval and incorporation into the judgment of dissolution was unconscionable, fraudulent, or obtained through coercion or duress. Shelley alleged that the MSA was unconscionable because she received nothing but debt and a vehicle, did not receive anything from the "marital property" that was paid off, Kurtis was making $80,000, she had no job prior to divorce, and she now had a low paying job requiring her to reside in public housing. Count II claimed the MSA was fraudulent because Kurtis hid his total income and his retirement accounts. Count III claimed coercion and duress and alleged that Kurtis led Shelley to believe that he would continue to support her despite the terms of the MSA.

¶ 51    Grounds for relief under section 2-1401 include fraud or duress, mutual mistake of fact, newly discovered evidence, or unconscionability. *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d at 214. The purpose of a relief from judgment petition "is to bring before the court facts not appearing in the record, which, if known at the time of entry of judgment, would have prevented its rendition." *In re Marriage of Onishi-Chong*, 2020 IL App (2d) 180824, ¶ 28. "Courts apply this section with the aim of achieving justice, not to give the litigant 'a new opportunity to do that which should have been done in an earlier proceeding' nor to relieve the litigant 'of the consequences of his mistake or negligence.' " *In re Marriage of Broday*, 256 Ill. App. 3d 699, 705 (1993) (quoting *In re Marriage of Travlos*, 218 Ill. App. 3d 1030, 1035 (1991)).

¶ 52    An agreement which merely favors one party over another does not make it unconscionable. *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d at 220. Settlement agreements should not be set aside "merely because one party has second thoughts." *In re Marriage of*

20

*Steichen*, 163 Ill. App. 3d 1074, 1079 (1987). When a party seeks to vacate a settlement incorporated into a divorce decree, "all presumptions are in favor of the validity of the settlement." *In re Marriage of Riedy*, 130 Ill. App. 3d 311, 313 (1985).

¶ 53    Marital settlement agreements are contracts, and thus the rules governing the interpretation of contracts apply. *In re Marriage of Tronsrue*, 2025 IL 130596, ¶ 46; *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15. "[T]he propriety of a property settlement must be determined in light of the positions and the needs of the individuals concerned, and not upon the circumstances presented and conclusions reached in another case." *Horwich v. Horwich*, 68 Ill. App. 3d 518, 521 (1979) (citing *James v. James*, 14 Ill. 2d 295, 305 (1958)). The fact that a spouse changes their mind after entering into a settlement agreement does not render the settlement agreement invalid. *Id.* at 522. The validity of a marital settlement agreement is presumed absent a showing to the contrary. *In re Marriage of Hawkins*, 160 Ill. App. 3d 71, 75 (1987) (citing *Waggoner v. Waggoner*, 66 Ill. App. 3d 901, 905 (1978)). "The burden of proving fraud or concealment is on the party asserting it, and that burden is more onerous when a party seeks to vacate, modify and/or amend a property settlement incorporated in a divorce decree." *Waggoner*, 66 Ill. App. 3d at 905.

¶ 54    Here, Shelley presented the MSA that she drafted, and was executed by both parties, to the circuit court and requested that the court enter a judgment of dissolution that incorporated the terms of the MSA. Paragraph 8 of the MSA stated that:

> "both parties expressly state that they have each freely and voluntarily entered into this Agreement of their own volition, free of any duress or coercion and with full knowledge of each and every provision contained in this Agreement and the consequences thereof; Each party expressly states that no representation has been made to him or her by the other party other than what is contained in this

21

Agreement; that the parties, after carefully considering the terms of this Agreement state that they do not regard it to be unconscionable."

Paragraph 9 of the MSA further stated that "Husband and Wife have declined to obtain attorneys, and the Wife has drafted this instrument, and this instrument purports to be, and in fact is, a written expression of the oral argument heretofore entered between the parties."

¶ 55    Pursuant to section 2-1401, Shelley must now show "(1) that if the ground for relief had been known at the time judgment was entered, it would have prevented the entry of judgment against [her]; and (2) that failure to discover and present the ground for relief was not the result of [her] own lack of diligence." *In re Marriage of Travlos*, 218 Ill. App. 3d at 1035 (1991) (citing *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 283 (1982)). While Shelley's section 2-1401 petition requested relief after pleading unconscionability, fraud, and coercion and duress, the pleading Shelley placed in front of the circuit court for the prove-up hearing, specifically stated that the parties understood the terms in the MSA, disavowed the presence of unconscionability, coercion and duress as to the terms and the document, and further averred that the document represented the oral argument of the parties.

¶ 56    Admittedly, it is difficult to overlook the parties' agreement, and disavowal of unconscionability, coercion, and duress. However, even if we ignore the obvious contradictions this case presents, in order to affirm, we must find that the grounds were based on "newly discovered evidence"[2] which is evidence that "could not reasonably have been discovered at the time of or prior to the entry of judgment." *Id.* Here, we consider Shelley's testimony and the circuit

---

[2]Admittedly, coercion and duress can be the basis of a section 2-1401 petition (see, *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d at 214 and the due diligence requirement can also be relaxed for coercion and duress. See *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 38, *In re Marriage of Weeks*, 2021 IL App (5th) 200043-U, ¶ 47. However, the circuit court did not find coercion or duress and therefore we limit our discussion to newly discovered evidence.

court's findings to determine if the evidence could have been discovered prior to the entry of judgment.

¶ 57    The circuit court first found that not all the information was provided to the circuit court at the November 8, 2018, prove-up hearing. The "missing" information included the marital home, the surrounding sharecropped land, and nonmarital real estate. Shelley's testimony revealed that while she may not have been aware of the proper classification of the real property as marital or nonmarital, she was aware that the parties owned a home and sharecropped land surrounding the marital home at the time the MSA was drafted. The same information was known when Shelley presented the MSA and judgment to the circuit court at the prove-up hearing on November 8, 2018. As such, the "missing" information cannot be classified as "newly discovered evidence."

¶ 58    The circuit court also relied on Shelley's testimony of oral agreements between her and Kurtis that were not included in the MSA. These statements contended that Kurtis would take care of Shelley after the divorce by selling the marital home and splitting the profits with her. Once again, Shelley's testimony confirmed that the statements were provided prior to the entry of judgment. As such, the oral agreements cannot be classified as "newly discovered evidence."

¶ 59    The circuit court also relied on Shelley's lack of information related to the retirement accounts. It contended that Shelley did not know the amounts held therein because she was not in the marital home at the time of the dissolution. Even if true, Shelley's testimony confirmed that she was aware of the retirement accounts and asked Kurtis to inquire as to whether funds could be removed from the accounts. At no time did Shelley testify that Kurtis refused to provide her with the amounts contained in the retirement accounts or any documentation related to the accounts, had she simply requested the information. As such, we cannot find that anything regarding the retirement accounts involved "newly discovered evidence."

23

¶ 60    The circuit court's order also took issue with the fact that the MSA did not provide for maintenance and credited Shelley's testimony that she did not know what that term, or alimony, meant. We note, however, that the finding is controverted by the MSA drafted by Shelley which stated the parties had "full knowledge of each and every provision contained" in the MSA. For the sake of argument, however, we will assume she was unaware of the term's definition and that she believes the definition is "newly discovered evidence."

¶ 61    The circuit court also relied on the MSA's agreement that no child support would be paid by either party, specifically noting language in paragraph 14 that "[e]ach party is employed and otherwise able to care for the minor children while they are in that parents physical custody." The court classified the statement saying, "that information was not correct." Again, the fact that no child support would be paid by either party was a term of the MSA and was not "newly discovered evidence." Further, if Shelley was not working at the time she executed the MSA or presented the MSA to the circuit court, it was certainly knowledge that she had at the time of the prove-up hearing and cannot be properly classified as "newly discovered evidence." However, contrary to the circuit court's finding the information was "not correct," Shelley's testimony at the hearing confirmed that she had full-time employment at the time the MSA was entered.

¶ 62    Here, the circuit court never conducted any inquiry as to the "newly discovered evidence." Instead, the court jumped directly to whether Shelley was diligent in presenting the claim to the circuit court in the original action. While we agree with the circuit court's statement that it did "not encourage similar conduct," we analyze the evidence relied upon by the circuit court to find due diligence in conjunction with case law explaining due diligence.

¶ 63    "Due diligence requires the section 2-1401 petitioner to have a reasonable excuse for failing to act within the appropriate time." *Airoom, Inc.*, 114 Ill. 2d at 222. "Since section 2-1401

24

does not afford a litigant a remedy whereby he may be relieved of the consequences of his own mistake or negligence [citations], a party relying on section 2-1401 is not entitled to relief 'unless he shows that through no fault or negligence of his own, the error of fact or the existence of a valid defense was not made to appear to the trial court.' " *Id.* (quoting *Brockmeyer v. Duncan*, 18 Ill. 2d 502, 505 (1960)). "Specifically, the petitioner must show that his failure to defend against the lawsuit was the result of an excusable mistake and that under the circumstances he acted reasonably, and not negligently, when he failed to initially resist the judgment." *Id.* "In determining the reasonableness of the excuse offered by the petitioner, all of the circumstances attendant upon entry of the judgment must be considered, including the conduct of the litigants and their attorneys." *Id.*

¶ 64     It is also noted that the requirement to "demonstrate due diligence is not inflexible." *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 38. A court may relax the requirement of due diligence "where justice and good conscience" require it. *Airoom, Inc.*, 114 Ill. 2d at 225. However, the relaxation must be balanced against "principles of equity and an ordered concept of justice." *Id.* at 227. To strike this balance, due diligence is only relaxed "in circumstances which point to unfair, unjust, or unconscionable conduct or deception *on the part of the 2-1401 respondent or his/her counsel in procuring the judgment*." (Emphasis added.) *In re Marriage of Weeks*, 2021 IL App (5th) 200043-U, ¶ 47 (citing *Airoom, Inc.*, 144 Ill. 2d at 228). Here, the judgment was procured by the petitioner. As such, no relaxation of the due process requirement is proper.

¶ 65     Starting with the missing information regarding the real property, it is undisputed that Shelley was aware of the property at the time of the initial hearing. As the drafter of the MSA, she knew what information regarding the real property was included in the MSA. There is no evidence that Shelley told the circuit court that other real property, beyond that set forth in the MSA, existed.

25

As the information was known at the prove-up hearing, due diligence cannot be found for the real property.

¶ 66    Similarly, Shelley was aware of the oral agreement to sell the marital home and split the proceeds at the time of the prove-up hearing. Instead of informing the court that the MSA did not incorporate all of the oral agreements, she presented the circuit court with a document stating that the MSA was "in fact" "a written expression of the oral agreement heretofore entered into between the parties." As Shelley was aware of the contradiction and failed to present it to the circuit court due diligence cannot be found.

¶ 67    As to the retirement accounts, again Shelley was aware of their existence at the time of the first hearing. While she may not have known the exact amount, there was also no testimony that she asked for the information from Kurtis or that Kurtis acted in a manner that would have prohibited Shelley from obtaining the amounts or from obtaining counsel from a person who might know how retirement accounts can be distributed in a divorce. "If one does not avail himself of the means of knowledge open to him, he cannot be heard to say he was deceived by misrepresentations." *Dickinson v. Dickinson*, 305 Ill. 521, 528 (1922). As the information regarding the retirement accounts was available and there was no testimony revealing a prohibition from obtaining the information before she drafted the MSA or presented it to the circuit court, due diligence cannot be found.

¶ 68    As to maintenance, Shelley stated that she did not know what the term "maintenance" or "alimony" meant. Even if Shelley may not have understood the term "maintenance," she provided no basis as to why she could not have looked for a definition while she was drafting the MSA since the term "maintenance" is found therein. See *id.* Instead, Shelley drafted a document that used the term and then included language in the MSA that stated the parties had "full knowledge of each

and every provision contained" in the MSA "and the consequences thereof." What is clear is that although Shelley knew the MSA stated that she knew and understood the terms of the MSA, she did not know and understand the terms and failed to inform the circuit court of this contradictory information at the prove-up hearing. Nor was any testimony provided as to why it would take 10 months to find the definitions for the words she allegedly did not understand. As such, due diligence cannot be found for maintenance either.

¶ 69    As to due diligence, it is clear that at no time before the circuit court did Shelley tell the circuit court (1) that real property existed beyond the home listed in the MSA and that she was unsure if it was marital or nonmarital property, (2) that she did not understand the terms of the MSA, (3) that she was not working when the MSA said that she was employed, (4) that the MSA failed to incorporate all of the parties' oral agreement, or (5) that she did not know that amounts in Kurtis's retirement accounts or if that asset was available for disbursement as part of the divorce. Instead, Shelley presented a document to the circuit court that stated the opposite. Such action cannot be classified as reasonable and therefore, due diligence cannot be found as to Shelley's actions before the circuit court.

¶ 70    Nor can due diligence be found in presenting the claims to the circuit court with a section 2-1401 petition. Shelley was granted the relief she requested, and the circuit court issued a judgment of dissolution that incorporated the MSA on November 8, 2018. Despite being aware of the contradictions between what she knew and what was presented in the MSA, Shelley did not proceed with her request for relief under section 2-1401 until August 14, 2019, over 10 months after the judgment was granted. No excuse for this delay was provided. " 'Relief under section [2-1401] is available only to those who diligently pursue their legal defenses and remedies in court, not to those who disregard these procedures on the gamble that better results can be obtained

27

through other procedures or at a cheaper cost.' " *Airoom, Inc.*, 114 Ill. 2d at 224 (quoting *Abbell v. Munfield*, 76 Ill. App. 3d 384, 388 (1979)). When the circumstances of this case are viewed in their entirety, there is no doubt that Shelley's dilemma is the result of her own negligence and indifference or disregard of the circuit court. Due diligence cannot be found when the erroneous facts were known at the time of the initial hearing, no attempt to clarify the misrepresentations were made at that time, petitioner was aware of the misrepresentations in the MSA because she drafted the document and then waited an additional 10 months to file a section 2-1401 petition. As such, we cannot find that Shelley showed due diligence either before the circuit court at the prove-up hearing or before the circuit court with the section 2-1401 petition and therefore hold that the circuit court's holding to the contrary was an abuse of discretion.

¶ 71 We further note that given Shelley's knowledge as both the drafter and presenter of the MSA to the circuit court, that the doctrine of waiver must also be considered. Waiver is defined as "the intentional relinquishment of a known right." *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 104 (1991). It also includes the intentional abandonment of a known right. *People v. Phipps*, 238 Ill. 2d 54, 62 (2010). Waiver may be made by express agreement or implied by the conduct of the party alleged to have waived the right. *Ryder*, 146 Ill. 2d at 105.

¶ 72 Here, the testimony revealed that Shelley was well aware of all the contradictions between the MSA and the alleged facts as they existed at the time the MSA was presented to the trial court. Instead of clarifying the erroneous sections in the MSA at the prove-up hearing, Shelley presented a document that stated the parties had "full knowledge of each and every provision contained in" the MSA, the "consequences thereof" and that the MSA incorporated the parties' oral agreements. The express waivers in the MSA undermines any section 2-1401 request for relief that Shelley seeks, as it specifically disavowed duress, coercion, unincluded oral agreements (that were the

28

basis of Shelley's claim of fraud) and unconscionability. While these might be defenses for a party who was not the drafter of the document, here, Shelley drafted the MSA and presented the document to the court. Given these facts, we find that Shelley affirmatively and expressly waived any right to claim duress, coercion, fraud or unconscionability by drafting and submitting the MSA that specifically disavowed those claims.

¶ 73    Finally, although not directly applicable here, we find support for our conclusion in the invited error doctrine. Under the doctrine of invited error, "a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of the error which that party injected into the proceedings." *Id.* Our supreme court "has viewed cases of acquiescence strictly, finding that a party's 'active participation in the direction of the proceedings *** goes beyond mere waiver' such that the traditional exceptions to the waiver rule do not apply." *Id.* at 218 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). While the invited error doctrine is typically applied when errors raised on appeal that were the direct result of a party's request before the trial court (see *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33) we find no reason why the underlying rationale of that doctrine would not be applicable for purposes of a section 2-1401 petition. Allowing the petitioner to proceed in this matter with her section 2-1401 petition would give her a second opportunity to do that which should have been done in the initial proceedings. See *In re Marriage of Himmel*, 285 Ill. App. 3d 145, 148 (1996). As such, we hold that under the facts of this case that Shelley's section 2-1401 petition is barred from seeking relief under grounds that were specifically disavowed in an earlier proceeding, when the petitioner, as here, drafted the document disavowing those grounds.

29

¶ 74     Finally, although it appears that the trial court's finding of unconscionability stemmed from the earlier erroneous findings related to the section 2-1401 petition, we note that Shelley's petition also requested a finding of unconscionability under section 502(b) of the Act. "The determination of whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo*." *Kinkel v. Cingular Wireless, LCC*, 223 Ill. 2d 1, 22 (citing *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99 (2006)). "*De novo* review means that we examine the evidence unconstrained by the reasoning of the trial court." *Zameer v. City of Chicago*, 2013 IL App (1st) 120198, ¶ 12.

¶ 75     Unconscionability exists when there is "an absence of a meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotations marks omitted.) *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 30. Contracts can be procedurally unconscionable, substantively unconscionable, or both. *Id.* Procedural unconscionability involves the impropriety during the process of forming a contract that deprives a party of a meaningful choice. *Id.* It includes situations " 'where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it ***.' " *Kinkel*, 223 Ill. 2d at 22 (quoting *Razor*, 222 Ill. 2d at 100). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability." *Id.* (citing *Razor*, 222 Ill. 2d at 100).

¶ 76     Substantive unconscionability involves a situation in which a clause or term of the contract is totally one-sided or harsh. *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 30. " 'Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.' " *Kinkel*, 223 Ill. 2d at 28 (quoting *Maxwell v.*

*Fidelity Financial Services, Inc.*, 184 Ariz. 82, 89 (1995)). "To determine whether an agreement is unconscionable, the court must consider [two factors:] (1) the [circumstances and] conditions under which the agreement was made and (2) the economic circumstances of the parties that result from the agreement." *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 69 (citing *In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 19). The "facts existing immediately after the agreement is made" are those considered for determining unconscionability. *Id.*

¶ 77    Here, it was undisputed that Shelley was the drafter of the MSA. Therefore, every term included in the MSA was at Shelley's discretion. There is no disparity between the bargaining power between the contract drafter and the party claiming unconscionability because they are one and the same. Nor can it be said that terms were hidden or that Shelley was deprived of a meaningful choice when she wrote the document that was signed by the parties. As such, procedural unconscionability cannot be found.

¶ 78    Substantive unconscionability requires an indicium that the contract terms are so one-sided that they are oppressive or unfairly surprise an innocent party. *Kinkel*, 223 Ill. 2d at 28. We find it is difficult to show the terms of an MSA are oppressive when the party claiming the oppression drafted the MSA. Similarly, it is equally difficult to find that Shelley would be unfairly surprised by the terms of the MSA when she was the person who put the terms in the MSA. While we note that Shelley's economic circumstances may not be as favorable as Kurtis's, we cannot find that the terms of the agreement Shelley drafted rise to a level of substantive unconscionability. The facts existing immediately after the agreement was made reveal that the parties would have equal parenting time, no child support would be paid, and the parties would split two tax exemptions related to the children equally with each parent alternating receipt of the tax exemption for the third child. Further, although the amounts were not provided in the MSA, the facts existing

31

immediately after the agreement was made left Kurtis obligated to pay the remaining amount due on the 2008 Chevrolet Suburban, three credit cards, and the consumer collection management debt. It also left Shelley responsible for two credit cards. Further, the MSA stated that both parties were employed. Nothing about those facts supports the conclusion that Shelley's economic circumstances, at the time the agreement was made, were substantively unconscionable.

¶ 79 Further, even if we extended our review to a time later than when the agreement was made, child support is now being paid to Shelley, and based on the 2019 tax documents, she claimed all three children as tax exemptions leaving none for Kurtis. The testimony at the hearing revealed that Kurtis paid off the Suburban and one of the credit cards for which Shelley was responsible was also paid off. Shelley provided no evidence of the values attached to any of the assets in the MSA. The assets that were valued at the hearing included the marital home valued at $40,000 and Kurtis's retirement accounts valued between $100,000 and $150,000. However, no value as of the date of the MSA was entered was provided. Nor was any value provided for the amount of funds Shelley removed from the joint account prior to entering the MSA except to state it was less than the amount in the 401(k). Further, no value was attached to the liability assigned to Kurtis, beyond the $20,000 due on the Suburban. As such, we cannot find, looking at either the period when the MSA was entered, or at the time of the hearing, that the underlying MSA was substantively unconscionable.

¶ 80 Regardless of whom the MSA favored, the fact that an agreement favors one party over another does not make it unconscionable. *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d at 220. Given the lack of values for the assets and liabilities, we cannot find the document was substantively unconscionable. Accordingly, we reverse the trial court's findings that the MSA was unconscionable.

32

¶ 81 CONCLUSION

¶ 82 For the above-stated reasons, we affirm the circuit court's September 8, 2021, ruling that denied Kurtis's motion for summary judgment and reverse the circuit court's May 10, 2024, order granting Shelley's petition to vacate.

¶ 83 Affirmed in part, reversed in part.